# LEWIS, COMPTROLLER OF FLORIDA *v.* BT INVEST-MENT MANAGERS, INC., ET AL.

No. 79–45. Argued January 15, 1980—Decided June 9, 1980

28

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Erwin N. Griswold* argued the cause for appellant. On the brief were *Eugene J. Cella* and *Franklyn J. Wollett.*

*John L. Warden* argued the cause for appellees. On the brief were *John E. Mathews, Jr., Stephen E. Day,* and *Vincent J. Rio III.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case concerns the constitutionality of two Florida statutes regulating the conduct of·investment advisory and trust services within that State. A three-judge United States District Court, convened pursuant to 28 U. S. C. § 2281 (1970 ed.),[1] held that the statutes violate the Commerce Clause, U. S. Const., Art. 1, § 8, cl. 3, because in combination they discriminate against bank holding companies that operate principally outside Florida. It also held that such discrimination is not authorized by federal legislation regulating the interstate operations of bank holding companies. The case was brought here on direct appeal, see 28 U. S. C. § 1253, and we noted probable jurisdiction to resolve the substantial constitutional and statutory issues presented. 444 U. S. 822 (1979).

---

*Briefs of *amici curiae* urging reversal were filed by *Erwin N. Griswold* and *James F. Bell* for the Conference of State Bank Supervisors; and by *J. Thomas Cardwell* and *Michael P. McMahon* for the Florida Bankers Association.

*John L. Warden* and *Robert D. Owen* filed a brief for the New York Clearing House Association as *amicus curiae* urging affirmance.

[1] This action was filed on October 24, 1973, and is therefore unaffected by the subsequent repeal of 28 U. S. C. § 2281, which by its terms was made inapplicable to any action commenced on or before August 12, 1976. See Pub. L. 94–381, § 7, 90 Stat. 1120.

I

Appellee Bankers Trust New York Corporation (Bankers Trust) is a corporation organized under the laws of the State of New York. It maintains its principal place of business in that State. It is a bank holding company within the meaning of § 2 (a) of the Bank Holding Company Act of 1956, 70 Stat. 133, as amended, 12 U. S. C. § 1841 (a) (1976 ed. and Supp. II) (Act). Accordingly, it is subject to federal restrictions on the kinds of subsidiaries it may own or control. Upon authorization from the Board of Governors of the Federal Reserve System, however, it is permitted to own or control shares of any company the business of which is "so closely related to banking or managing or controlling banks as to be a proper incident thereto." § 4 (c)(8) of the Act, 12 U. S. C. § 1843 (c)(8). By regulation, the Board has designated both the provision of investment or financial advice and the performance of certain trust functions as "closely related" business within the meaning of this statute. See 12 CFR §§ 225.4 (a)(4) and (5) (1979).

In 1972, the management of Bankers Trust decided to seek the Board's approval for an investment management subsidiary to operate in Florida. On October 3 of that year, Bankers Trust filed a formal proposal for such a subsidiary, which it planned to operate from offices in Palm Beach. Appellee BT Investment Managers, Inc. (BTIM), was Bankers Trust's intended vehicle for entry into the Florida market. It was incorporated under the laws of the State of Delaware as a wholly owned subsidiary on November 24, 1972. Three days later it qualified to do business in Florida. The application to the Board proposed that BTIM would provide "portfolio investment advice," as well as "general economic information and advice, general economic statistical forecasting services and industry studies" to persons other than banks. See Complaint ¶ 7, App. 9–10, and appellant's Answer ¶ 7, App. 19.

When Bankers Trust filed its application with the Board, certain Florida statutes restricted the ability of out-of-state bank holding companies to compete in the State's financial market. At that time Fla. Stat. § 659.141 (1), added by 1972 Fla. Laws, ch. 72–96, § 1, and effective March 28, 1972, prohibited Bankers Trust from owning or controlling a bank or trust company located within the State; the same statute also prohibited it from owning businesses furnishing investment advisory services to local banks or trust companies. In addition, Fla. Stat. § 660.10 prohibited any corporation, other than a state-chartered bank and trust company or a national banking association located in Florida, from performing certain trust and fiduciary functions. Neither statute, however, directly prohibited an out-of-state bank holding company from owning or controlling a business furnishing investment advisory services to the general public. Thus, at the time Bankers Trust filed its application with the Board, it appeared that ownership of BTIM would not violate Florida law, although BTIM would be restricted in the types of financial services it could perform and the customers it could serve.

The reaction of the Florida financial community to Bankers Trust's proposed investment subsidiary was decidedly negative. The State Comptroller, the Florida Bankers Association, and the Palm Beach County Bankers Association, Inc., all filed comments with the Board objecting to the Bankers Trust proposal. More importantly for present purposes, the state legislature was persuaded to take action. On November 30, 1972, shortly after BTIM had qualified to do business in the State, a special session of the legislature amended Fla. Stat. § 659.141 (1). That statute, which had been on the books only since March 28 of that year, was expanded to prohibit an out-of-state bank holding company from owning or controlling a business within the State that sells investment advisory services to any customer, rather than just to "trust companies or banks" in Florida, as the statute theretofore had

read.[2]   This amendment took effect, without the Governor's approval, on December 21, 1972.   There is evidence that the amendment was a direct response to Bankers Trust's pending application, and that it had the strong backing of the local financial community.

On April 26, 1973, the Board rejected Bankers Trust's proposal on the ground that it would conflict with state law. *Bankers Trust New York Corp.*, 59 Fed. Res. Bull. 364.   The Board observed that the proposal contemplated *de novo* entry into the Florida investment management market rather than acquisition of an existing concern, and it noted that *de novo* entry ordinarily has a desirable procompetitive impact.   Absent evidence of a contrary effect in this case, the Board intimated that it would have been favorably inclined toward the proposal.   But it found that the December amendment to Fla. Stat. § 659.141 (1) "was intended to, and does, prohibit the performance of investment advisory services in Florida by non-Florida bank holding companies."   59 Fed. Res. Bull., at 365.   In view of its obligation to respect the dictates of state law, the Board found itself constrained to reject the proposal.   See 12 U. S. C. § 1846; *Whitney Nat. Bank* v. *Bank of New Orleans,* 379 U. S. 411, 424–425 (1965).

Within six months of the Board's decision, the two appellees

---

[2] See 1972 Fla. Laws, ch. 72–726, §§ 1–7.   As so amended, § 659.141 (1) reads in pertinent part:

"[N]o bank, trust company, or holding company, the operations of which are principally conducted outside this state, shall acquire, [or] retain, *or own,* directly or indirectly, all, or substantially all the assets of, or control over, any *bank or* trust company having a place of business in this state where the *business of banking or* trust business or functions are conducted, or acquire, [or] retain, *or own* all, or substantially all, of the assets of, or control over, any business organization having a place of business in this state where or from which it furnishes investment advisory services [to trust companies or banks] in this state."

The italicized words were added, and the bracketed words were deleted, by the December 1972 amendment.

filed this action seeking declaratory and injunctive relief.[3] Count I of their complaint alleged that Fla. Stat. § 659.141 (1) "is not designed to promote lawful regulatory objectives, but is intended to shelter those organizations presently conducting an investment advisory business in Florida from competition by [BTIM]." Complaint ¶ 11, App. 11. The complaint alleged violations of the due process and equal protection guarantees of the Fourteenth Amendment, as well as violation of the Commerce Clause. Count II alleged similar constitutional defects as the result of the joint operation of §§ 659.141 (1) and 660.10. Appellees alleged that "[b]ut for the existence of the challenged statutes," Bankers Trust would seek authority from the Board to establish "a subsidiary trust company having a national bank charter or a Florida state charter" that would engage exclusively in one or more of the functions regulated by § 660.10. Complaint ¶ 21, App. 14–15. A three-judge court was convened pursuant to 28 U. S. C. § 2281 (1970 ed.), and the case was submitted for summary judgment on a stipulated set of facts.

The District Court, by a divided vote, initially dismissed the complaint without prejudice on the ground that it should abstain from decision under either *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941), or *Burford* v. *Sun Oil Co.*, 319 U. S. 315 (1943). *BT Investment Managers, Inc.* v. *Dickinson*, 379 F. Supp. 792 (ND Fla. 1974). The United States Court of Appeals for the Fifth Circuit, however, reversed and remanded for consideration of the merits. 559 F. 2d 950 (1977).

On remand, the District Court held that the challenged portions of the two statutes violate the Commerce Clause. 461 F. Supp. 1187 (1978). Without reaching appellees' due process and equal protection arguments, it found that the

---

[3] Bankers Trust in November 1973 petitioned the United States Court of Appeals for the Second Circuit for review of the Board's order denying the proposal. That petition has been withdrawn, with leave to reinstate, pending the outcome of this suit.

statutes under attack discriminate against interstate commerce. The court reasoned that § 659.141 (1) "erects an insuperable barrier to the entry of foreign-based bank holding companies, through their subsidiaries, into the Florida investment advisory market," and that § 660.10 "similarly cordons off Florida trust companies from competition by out-of-state concerns." 461 F. Supp., at 1196. It ruled that the statutes are "parochial legislation" that "must be deemed per se unconstitutional." *Ibid.* Moreover, it held that the legislative purposes proffered by appellant, including a purported desire to curb anticompetitive abuses arising from agglomeration of financial power, failed to justify the discriminatory impact of the statutes.

Finally, the District Court held that the federal Bank Holding Company Act does not foster or permit the types of discrimination against out-of-state bank holding companies reflected in the Florida statutes. The court eschewed the argument that either § 3 (d) of the Act, 12 U. S. C. § 1842 (d), or § 7 of the Act, 12 U. S. C. § 1846, authorized the statutes in question. It recognized that § 3 (d) prohibits bank holding companies from acquiring banking subsidiaries in other States without local authorization. But it rejected the contention that this prohibition implicitly extends as well to related businesses, such as the providing of investment advice.

The court issued an order granting declaratory relief against both statutes but enjoining the enforcement of only § 659.141 (1) against appellees.[4]

---

[4] Initially the court declared the entire first sentence of § 659.141 (1) unconstitutional. App. to Juris. Statement A1. It amended that order, however, to limit its declaration to that portion of the sentence dealing with investment advisory and trust services. See *id.*, at D1–D2. The court rendered no decision on the constitutionality of those portions of the statute that govern acquisition of Florida banks by out-of-state banks, bank holding companies, or trust companies. The court refused to grant injunctive relief against § 660.10 because appellees had yet to attempt establishment of a trust company in Florida; the court accordingly determined that

## II

This appeal presents two distinct but related questions with respect to the validity of the challenged Florida statutes.[5] The first is whether the statutes, viewed independently of federal legislation regulating the banking industry, burden interstate commerce in a manner contrary to the Commerce Clause. The second is whether Congress, by its own legislation in this area, has created an area in which the States may regulate free from Commerce Clause restraints. Since there is no contention that federal legislation pre-empts the state laws in question, federal law becomes important only if it appears that the Florida statutes cannot survive without federal authorization. Thus, the second question becomes pertinent only if we reach an affirmative answer to the first.

These questions arise against a backdrop of familiar principles. The Commerce Clause grants to Congress the power "[t]o regulate Commerce . . . among the several States." U. S. Const., Art. 1, § 8, cl. 3. Although the Clause thus speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade. See, *e. g., Hughes* v. *Oklahoma,* 441 U. S. 322, 326 (1979); *Philadelphia* v. *New Jersey,* 437 U. S. 617, 623 (1978); *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 534–538 (1949); *Cooley* v. *Board of*

---

injunctive relief against that statute would be premature. 461 F. Supp. 1187, 1201 (ND Fla. 1978).

[5] Because the District Court granted injunctive relief with respect to § 659.141 (1), we have jurisdiction, under 28 U. S. C. § 1253, over the appeal. See *White* v. *Regester,* 412 U. S. 755, 761 (1973). See, however, Part IV, *infra.*

While this case was pending in the District Court, the Florida Division of Securities, acting pursuant to a "grandfather" clause, Fla. Stat. § 659.141 (3), authorized Bankers Trust to conduct investment advisory services from a single Florida office. This authorization does not moot the controversy, because the District Court's injunction leaves Bankers Trust free to establish additional offices that § 659.141 (1) would otherwise prohibit.

*Wardens,* 12 How. 299 (1852). This limitation upon state power, of course, is by no means absolute. In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of "legitimate local concern," even though interstate commerce may be affected. See, *e. g., Raymond Motor Transportation, Inc.* v. *Rice,* 434 U. S. 429, 440 (1978); *Great A&P Tea Co.* v. *Cottrell,* 424 U. S. 366, 371 (1976). Where such legitimate local interests are implicated, defining the appropriate scope for state regulation is often a matter of "delicate adjustment." *Ibid.,* quoting *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S., at 553 (Black, J., dissenting). Yet even in regulating to protect local interests, the States generally must act in a manner consistent with the "ultimate . . . principle that one state in its dealings with another may not place itself in a position of economic isolation." *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 527 (1935). However important the state interest at hand, "it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Philadelphia* v. *New Jersey,* 437 U. S., at 626–627.

Over the years, the Court has used a variety of formulations for the Commerce Clause limitation upon the States, but it consistently has distinguished between outright protectionism and more indirect burdens on the free flow of trade. The Court has observed that "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *Id.,* at 624. In contrast, legislation that visits its effects equally upon both interstate and local business may survive constitutional scrutiny if it is narrowly drawn. The Court stated in *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137 (1970):

"Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld

> unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*, at 142.

See also *Hughes* v. *Oklahoma,* 441 U. S., at 336; *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333, 353 (1977); *Great A&P Tea Co.* v. *Cottrell,* 424 U. S., at 371–372; *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440, 443 (1960). The principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects. See *Hughes* v. *Oklahoma,* 441 U. S., at 336; *Best & Co.* v. *Maxwell,* 311 U. S. 454, 455–456 (1940).

## III

With these principles in mind, we first turn to § 659.141 (1). This statute has been the chief object of controversy, since it is the statute that prevents appellees from setting up their projected investment advisory business within Florida. The statute prohibits ownership of local investment or trust businesses by firms possessing two characteristics: a certain kind of business organization and purpose, whether it be as a bank, trust company, or a bank holding company; and location of principal operations outside Florida.

Appellant and the *amici* supporting his position argue that the District Court's analysis of § 659.141 (1) is flawed in three respects: First, the statute assertedly affects only matters of local character that have insufficient interstate attributes to bring federal constitutional limitations into play.[6] Second,

---

[6] Appellant advanced this argument in the District Court but has substantially departed from it on appeal. Supporting amici, however, con-

38

the District Court erroneously labeled the statute protectionist legislation and thus incorrectly relied upon the *"per se* rule of invalidity" identified in *Philadelphia* v. *New Jersey,* 437 U. S., at 624. Appellant argues that the statute should be treated as neutral legislation subject to the less stringent standards of *Pike* v. *Bruce Church, Inc., supra,* and he argues that it meets this test. Third, the District Court failed to accord proper significance, in appellant's view, to the Bank Holding Company Act of 1956. Appellant argues that the Act grants authority to the States to prohibit out-of-state bank holding companies from owning local subsidiaries that provide bank-related services.

## A

The first of these arguments needs only brief mention. We readily accept the submission that, both as a matter of history and as a matter of present commercial reality, banking and related financial activities are of profound local concern. As appellees freely concede, Brief for Appellees 17, n. 10, sound financial institutions and honest financial practices are essential to the health of any State's economy and to the well-being of its people. Thus, it is not surprising that ever since the early days of our Republic, the States have chartered banks and have actively regulated their activities.

Nonetheless, it does not follow that these same activities lack important interstate attributes. An impressive array of federal statutes regulating not only the provision of banking services but also the formation of banking organizations, the rendering of investment advice, and the conduct of national investment markets, is substantial evidence to the contrary.[7]

tinue to press the contention. See, *e. g.,* Brief for Conference of State Bank Supervisors as *Amicus Curiae* 8–12.

[7] Some of the leading examples of federal regulation of banking, trust, and investment businesses include the National Bank Act, 12 U. S. C. § 21 *et seq.;* the Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.;* the Securities Exchange Act of 1934, 48 Stat. 881, as

We do not understand appellant to dispute the validity of these enactments, all of which rest primarily on Congress' powers under the Commerce Clause. Indeed, appellant's arguments under the Bank Holding Company Act assume the validity of federal regulation in this sphere. This Court has observed that the same interstate attributes that establish Congress' power to regulate commerce also support constitutional limitations on the powers of the States. *Philadelphia* v. *New Jersey*, 437 U. S., at 622–623. For present purposes, it is clear that those limitations apply.

## B

The contentions that the District Court erred by applying too stringent a standard in defining the limits of Florida's regulatory authority, and that § 659.141 (1) is evenhanded local regulation, are more substantial. We nonetheless agree with the District Court's conclusion that this statute is "parochial" in the sense that it overtly prevents foreign enterprises from competing in local markets.

The statute makes the out-of-state location of a bank holding company's principal operations an explicit barrier to the presence of an investment subsidiary within the State. As Bankers Trust's application before the Board itself indicates, it thus prevents competition in local markets by out-of-state firms with the kinds of resources and business interests that make them likely to attempt *de novo* entry. Appellant virtually concedes this effect, Brief for Appellant 59, and the circumstances of enactment suggest that it was the legislature's principal objective.

Appellant argues, however, that the statute ought not to be

---

amended, 15 U. S. C. § 78a *et seq.;* the Trust Indenture Act of 1939, 53 Stat. 1149, as amended, 15 U. S. C. § 77aaa *et seq.;* and the Investment Company Act of 1940, 54 Stat. 789, as amended, 15 U. S. C. § 80a–1 *et seq.* For an express finding on the effect of investment advisory activities on interstate commerce, see Investment Advisors Act of 1940, § 201, 54 Stat. 847, 15 U. S. C. § 80b–1.

declared *per se* invalid because it does not prevent all out-of-state investment enterprises from entering local markets. Investment enterprises that are *not* bank holding companies, banks, or trust companies either may own investment subsidiaries in Florida or may enter the state investment market directly by obtaining a license to do business. Furthermore, locally incorporated bank holding companies are subject to the same restrictions as their foreign counterparts if they maintain their principal operations elsewhere. Appellant thus analogizes § 659.141 (1) to the Maryland statute prohibiting local retail operations by vertically integrated petroleum companies that the Court upheld in *Exxon Corp.* v. *Governor of Maryland,* 437 U. S. 117 (1978). The statute, it is said, discriminates against a particular kind of corporate organizational structure more than it does against the origin or citizenship of a particular business enterprise.

The statute involved in *Exxon* flatly prohibited producers and refiners of petroleum products from opening or operating retail services within Maryland under a variety of corporate or contractual arrangements. *Id.,* at 120, n. 1. It was enacted in response to perceived inequities in the allocation of petroleum products to retail outlets during the fuel shortage of 1973. Various oil companies, all of which engaged in production and refining as well as in sale of petroleum products, challenged the statute on a number of grounds. Among other arguments, they claimed that the statute violated the Commerce Clause because it discriminated against producers and refiners, all of which were interstate concerns, in favor of independent retailers, most of which were local businesses.

The Court rejected this contention. After holding that the statute served the legitimate state purpose of "controlling the gasoline retail market," *id.,* at 125, the Court separately analyzed its effect on interstate commerce in the producing-refining and retailing ends of the petroleum industry. The Court concluded that the statute could not discriminate

against interstate petroleum producers and refiners in favor of locally based competitors because, as a matter of fact, there were no such local producers or refiners to be favored. *Ibid.* For the same reason, it concluded that the flow of petroleum products in interstate commerce would not be reduced. *Id.,* at 127. It also rejected a claim of discrimination at the retail level because the statute placed "no barriers whatsoever" on competition in local markets by "interstate independent dealers" that did not own production or refining facilities. *Id.,* at 126. Despite the fact that the number of stations operated by independent dealers was small relative to the number operated by producer-refiners, the Court concluded that neither the placing of a disparate burden on some interstate competitors nor the shifting of business from one part of the interstate market to another was enough, under the circumstances, to establish a Commerce Clause violation. *Id.,* at 126–127.

There are some points of similarity between *Exxon* and the present case. In the former, the statute in issue discriminated against vertical organization in the petroleum industry. Section 659.141 (1) similarly discriminates against a particular kind of conglomerate organization in the investment and financial industries. And the Maryland statute permitted some kinds of interstate competitors free entry into the local market, as does the Florida statute at issue here.[8]

---

[8] Appellant also argues that the present statute, like the one in *Exxon Corp.* v. *Governor of Maryland,* 437 U. S., at 125, has no discernible impact on the flow of goods in interstate commerce. Locally owned investment businesses are as free to channel their clients' investments into interstate markets as their interstate competitors. The validity of this argument cannot be determined on this record. In the *Exxon* case, as we have noted, all petroleum products sold in the State were produced and refined elsewhere. In contrast, investments may be directed into local as well as interstate markets. Since it is at least conceivable that an investment subsidiary owned by a locally operating bank holding company would be more likely to recommend investments in local busi-

We disagree, however, with the suggestion that *Exxon* should be treated as controlling precedent for this case. Section 659.141 (1) engages in an additional form of discrimination that is highly significant for purposes of Commerce Clause analysis. Under the Florida statute, discrimination against affected business organizations is *not* evenhanded because only banks, bank holding companies, and trust companies with principal operations *outside* Florida are prohibited from operating investment subsidiaries or giving investment advice within the State. It follows that § 659.141 (1) discriminates *among* affected business entities according to the extent of their contacts with the local economy. The absence of a similar discrimination between interstate and local producer-refiners was a most critical factor in *Exxon*. Both on its face and in actual effect, § 659.141 (1) thus displays a local favoritism or protectionism that significantly alters its Commerce Clause status. See *Philadelphia* v. *New Jersey*, 437 U. S., at 626–627; *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S., at 527.[9]

We need not decide whether this difference is sufficient to render the Florida legislation *per se* invalid, for we are convinced that the disparate treatment of out-of-state bank holding companies cannot be justified as an incidental burden necessitated by legitimate local concerns. In the District Court and to some extent on this appeal, appellant and supporting *amici* have argued that the Florida legislation advances several important state policies. Among those that

---

nesses, we decline to assign any weight to this argument in the absence of proof concerning the actual effect of the Florida statute.

[9] Appellant's argument that § 659.141 (1) could also apply to locally organized bank holding companies, if they maintained their principal operations outside the State, is significantly weakened by federal restrictions on interstate expansion of a bank holding company's banking activities discussed in Part III–C, *infra*. As a result of these statutes, it is unlikely that many local bank holding companies would have their principal operations elsewhere. In any event, discrimination based on the extent of local operations is itself enough to establish the kind of local protectionism we have identified.

have been specifically identified are an interest in discouraging undue economic concentration in the arena of high finance; an interest in regulating financial practices, presumably to protect local residents from fraud; and an interest in maximizing local control over locally based financial activities. We think that these alleged purposes fail to justify the extent of the burden placed upon out-of-state bank holding companies.

Discouraging economic concentration and protecting the citizenry against fraud are undoubtedly legitimate state interests. But we are not persuaded that these interests justify the heavily disproportionate burden this statute places on bank holding companies that operate principally outside the State. Appellant has demonstrated no basis for an inference that all out-of-state bank holding companies are likely to possess the evils of monopoly power, that they are more likely to do so than their homegrown counterparts, or that they are any more inclined to engage in sharp practices than bank holding companies that are locally based.[10] Nor is there any reason to conclude that outright prohibition of entry, rather than some intermediate form of regulation, is the only effective method of protecting against the presumed evils, particularly when other out-of-state businesses that may be just as large or far-flung are permitted to compete in the local market. We conclude that these asserted state interests simply do not suffice to eliminate § 659.141 (1)'s apparent constitutional defect. Cf. *Hunt* v. *Washington Apple Advertising Comm'n*, 432 U. S., at 353–354; *Great A&P Tea Co.* v. *Cottrell*, 424 U. S., at 375–376.

With regard to the asserted interest in promoting local control over financial institutions, we doubt that the interest itself is entirely clear of any tinge of local parochialism. In almost any Commerce Clause case it would be possible for a State to argue that it has an interest in bolstering local ownership, or

---

[10] Both in-state and out-of-state bank holding companies, of course, are subject to extensive regulation by the Federal Government designed to protect against these same evils.

wealth, or control of business enterprise. Yet these arguments are at odds with the general principle that the Commerce Clause prohibits a State from using its regulatory power to protect its own citizens from outside competition. See *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S., at 538; *Buck* v. *Kuykendall,* 267 U. S. 307, 315–316 (1925); cf. *Toomer* v. *Witsell,* 334 U. S. 385, 403–404 (1948). In any event, the interest is not well served by the present legislation. The statute, for example, does not restrict out-of-state ownership of local bank holding companies. Nor, as appellant concedes, does it prevent entry by out-of-state entities other than those having the prohibited organizational forms. There is thus no reason to believe that the State's interest in local control, to the extent it legitimately exists, has been significantly or evenhandedly advanced by the statutory means that have been employed.

For these reasons, we conclude that the District Court did not err in holding that § 659.141 (1) directly burdens interstate commerce in a manner that contravenes the Commerce Clause's implicit limitation on state power.

## C

Ordinarily, at this point we would have reached the end of our inquiry. But in this instance appellant has another string to his bow: the contention that by Act of Congress the State has been given additional authority to regulate entry by bank holding companies into the local investment advisory market. Congress, of course, has power to regulate the flow of interstate commerce in ways that the States, acting independently, may not. And Congress, if it chooses, may exercise this power indirectly by conferring upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy. See *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S., at 542–543; *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408, 423–424 (1946); *International Shoe Co.* v. *Washington,* 326 U. S. 310, 315 (1945). It is appellant's view

that the Bank Holding Company Act of 1956, as amended, is enabling legislation of this very kind, and that it authorizes the restrictions on bank holding companies embodied in § 659.141 (1).

This argument rests on two provisions in the federal legislation. Section 3 (d) of the Act, 12 U. S. C. § 1842 (d), prohibits the Board from approving an application by a bank holding company to acquire "any additional bank" located outside the State in which the holding company has its principal operations, unless that acquisition is specifically authorized by the statutory law of the State in which the proposed acquisition is located.[11] Section 7 of the Act, 12 U. S. C. § 1846, reserves to the States a continuing role in the regulation of bank holding companies.[12] Appellant argues that

---

[11] Appellant relies on that part of § 3 (d) of the Bank Holding Company Act of 1956, 70 Stat. 135, as amended, 80 Stat. 238, 12 U. S. C. § 1842 (d), which provides:

"Notwithstanding any other provision of this section, no application shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's banking subsidiaries were principally conducted on the effective date of this amendment [July 1, 1966] or the date on which such company became a bank holding company, whichever is later, unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication. For the purposes of this section, the State in which the operations of a bank holding company's subsidiaries are principally conducted is that State in which total deposits of all such banking subsidiaries are largest."

A new subsection was added to this statute effective March 31, 1980. See Part IV, *infra*.

[12] Section 7 provides:

"The enactment by the Congress of the Bank Holding Company Act of 1956 shall not be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with

either or both of these provisions authorize the State to prohibit out-of-state bank holding companies from acquiring local investment subsidiaries.

The Bank Holding Company Act of 1956 was enacted to accomplish two primary objectives. First, it was designed to prevent the concentration of banking resources in the hands of a few financial giants. Second, it was intended to implement a congressional policy against control of banking and nonbanking enterprises by a single business entity. See S. Rep. No. 1095, 84th Cong., 1st Sess., 2 (1955); *Board of Governors* v. *First Lincolnwood Corp.*, 439 U. S. 234, 242–243 (1978). Underlying both objectives was a desire to prevent anticompetitive tendencies in national credit markets. See S. Rep. No. 91–1084, pp. 2–3 (1970).

Congress sought to accomplish these twin goals through separate statutory provisions. Section 3 of the Act placed limitations on the creation of bank holding companies and their expansion within the banking field. Section 3 (a) required Board approval for such activities as formation of bank holding companies, acquisition of bank stock or assets by such holding companies or their subsidiaries, and merger of bank holding companies. Section 3 (c) specified criteria to be considered by the Board in determining whether to grant approval. Section 4 sharply curtailed acquisition of nonbanking enterprises. Section 4 (a) generally forbade future acquisition of nonbanking enterprises. What was then § 4 (c)(6), however, carved out an exception for companies "of a financial, fiduciary, or insurance nature" if the Board determined that they are "so closely related to the business of banking or of managing or controlling banks as to be a proper incident thereto." 70 Stat. 137.

When this legislation was first proposed to the Senate, neither § 3 nor § 4 contained explicit limitations on interstate

---

respect to banks, bank holding companies, and subsidiaries thereof." 70 Stat. 138.

expansion by bank holding companies. See S. 2577, 84th Cong., 1st Sess., §§ 3, 4 (1955). But Senator Douglas introduced an amendment to § 3 prohibiting bank holding companies from expanding into banking across state lines. He argued that such an amendment was desirable in order to ensure that national banks would not use bank holding companies as mechanisms to evade state-law restrictions on branching of banks recognized and made applicable to national banks by the McFadden Act, 12 U. S. C. § 36. See 102 Cong. Rec. 6860 (1956) (remarks of Sen. Douglas). The Senate agreed to the amendment. A similar provision had been included in the companion bill introduced in the House of Representatives. See H. R. Rep. No. 609, 84th Cong., 1st Sess., 2–5, 15, 24 (1955). The "Douglas Amendment" emerged as § 3 (d) of the Act, the first of the two provisions on which appellant relies.

We conclude that § 3 (d) offers scant support for the portions of § 659.141 (1) subject to challenge in this proceeding. Preliminarily, it is doubtful that § 3 (d) authorizes state restrictions of any nature on bank holding company activities. The language of the statute establishes a general federal prohibition on the acquisition or expansion of banking subsidiaries across state lines. The only authority granted to the States is the authority to create exceptions to this general prohibition, that is, to *permit* expansion of banking across state lines where it otherwise would be federally prohibited. Furthermore, the structure of the Act reveals that § 3 (d) applies only to holding company acquisitions of banks. Non-banking activities are regulated separately in § 4, which does not contain a parallel provision. Even if § 3 (d) could be interpreted to authorize additional state regulation, ordinary canons of interpretation thus would lead to the inference that restraints so authorized could apply only to a holding company's banking activities.[13]

---

[13] Appellant attempts to answer the latter of these observations by arguing that the restrictions of § 3 (d) implicitly placed geographical

In contrast to § 3 (d), § 7 of the Act does reserve to the States a general power to enact regulations applicable to bank holding companies. This section was intended to preserve

limitations on the expansion of nonbanking activities as well. Appellant asserts that the Board initially gave § 4 (c) a narrow interpretation that effectively prohibited holding companies from owning nonbanking subsidiaries unless they were closely related to an existing banking operation controlled by the parent company. See, e. g., *Transamerica Corp.*, 43 Fed. Res. Bull. 1014, 1016–1017 (1957). Since such banking operations were geographically confined by virtue of § 3 (d), the Board's restrictive application of § 4 (c) assertedly applied the same limitation to nonbanking operations.

We agree with appellees that this argument has been significantly undercut by 1970 amendments to the Act that revised the language of § 4 (c). Although the principal purpose of those amendments was to extend the regulatory controls of the Act to one-bank holding companies that were formerly exempt, Congress also adopted changes designed to give the Board greater discretion in administering the Act. See S. Rep. No. 91–1084, pp. 12–13 (1970); H. R. Rep. No. 91–387, p. 14 (1969); see also Chase, The Emerging Financial Conglomerate: Liberalization of the Bank Holding Company Act, 60 Geo. L. J. 1225, 1236–1237 (1972). The Federal Reserve Board proposed several changes in § 4 (c) designed to liberalize the standards for expansion into "related" nonbanking enterprises. These proposals met with different receptions in the two Houses of Congress, and the final product was a compromise. A proposal to substitute the phrase "functionally related" for "closely related" was not adopted; but the phrase "financial, fiduciary, or insurance nature" was dropped from the statute, and "business of banking" was changed simply to "banking." Bank Holding Company Act Amendments of 1970, Pub. L. 91–607, § 103, 84 Stat. 1763; see Note, 39 Geo. Wash. L. Rev. 1200, 1219–1223 (1971).

There was substantial disagreement among House and Senate conferees over the exact import of these changes with respect to the breadth of nonbanking activities that the amendments would permit. Compare H. R. Conf. Rep. No. 91–1747, p. 21 (1970), and 116 Cong. Rec. 41950–41952 (1970) (remarks of Rep. Patman), with *id.*, at 41953–41954 (remarks of Rep. Widnall); *id.*, at 42424 (remarks of Sen. Sparkman); *id.*, at 42435–42436 (remarks of Sen. Bennett). See also Note, 71 Mich. L. Rev. 1170, 1206–1207 (1973). We need not enter that debate at this juncture. For present purposes, it is sufficient to note that the change from "business of banking" to "banking" was explicitly proposed in order to free

existing state regulations of bank holding companies, even if they were more restrictive than federal law. See S. Rep. No. 1095, 84th Cong., 1st Sess., 22 (1955). But we find nothing in its language or legislative history to support the contention that it also was intended to extend to the States new powers to regulate banking that they would not have possessed absent the federal legislation. Rather, it appears that Congress' concern was to define the extent of the federal legislation's pre-emptive effect on state law. In response to criticisms of the provision on the ground that it might be interpreted to expand state authority, one Committee Report stated that it was intended "to preserve to the States those powers which they now have in our dual banking system," yet "to make it clear that a State could not enact legislation inconsistent with the [Act] and therefore nullify its effect." S. Rep. No. 1095, 84th Cong., 2d Sess., pt. 2, p. 5 (1956). Far from creating a new state power to discriminate between foreign and local bank holding companies, the legislative history evinces an intent to forestall such a broad interpretation. We therefore conclude that § 7 applies only to state legislation that operates within the boundaries marked by the Commerce Clause.

Since neither of these provisions authorizes state legislation of the variety contained in the challenged portions of § 659.141 (1), we agree with the District Court that appellant's reliance on the Bank Holding Company Act is misplaced. The effects of the Florida statute on interstate commerce have not been permitted by Congress, and its Commerce Clause defects have not been removed. Therefore, the District Court's injunction against enforcement of the statute must be sustained.

---

the Board from its prior requirement of relationship to a bank holding company's existing banking enterprises. See S. Rep. No. 91–1084, p. 12 (1970); Letter dated November 23, 1970, from Arthur Burns, Federal Reserve Board Chairman, to Representative Patman, reprinted in 116 Cong. Rec. 41959 (1970); see also Note, 39 Geo. Wash. L. Rev., at 1220. Once that change was made, the implicit geographical limitation appellant infers from previous applications of the Act was removed along with the language from which it was derived.

## IV

This brings us, finally, to § 660.10. That statute prohibits all corporations except state-chartered banks and national banks having their operations in Florida from performing specified fiduciary functions. It does not purport to regulate the ownership of such institutions by bank holding companies. For the reasons stated below, we conclude that its constitutionality has been neither fully placed in issue nor fully determined by the District Court's decision. We therefore vacate the judgment with respect to § 660.10 and remand for such further proceedings as may be necessary in light of this opinion.

As we have already noted, appellees' complaint challenged the constitutionality of § 660.10 only insofar as it operated in conjunction with § 659.141 (1). The District Court followed the same approach, and it granted declaratory relief against § 660.10 on that basis. Jointly, of course, the statutes not only limit the kinds of corporations that may perform fiduciary functions within Florida, but also prevent out-of-state bank holding companies from owning such corporations as their subsidiaries. It was this joint effect that led the District Court to find that § 660.10 "cordons off Florida trust companies from competition by out-of-state concerns." 461 F. Supp., at 1196. Having so found, the District Court did not address the constitutionality of § 660.10 standing alone. It did not consider, for example, which of the many functions regulated by § 660.10 were in issue, or whether any of the exceptions created by that statute might apply. Indeed, it refused to grant injunctive relief against that statute and ruled that any challenge to its enforcement was premature. 461 F. Supp., at 1201.

On this appeal the argument over the constitutionality of § 660.10 has focused not on the concatenation of the two statutes, but on the power of a State under the Commerce Clause to require local incorporation as a condition of doing busi-

ness in local markets. Cf. *Railway Express Agency, Inc.* v. *Virginia,* 282 U. S. 440 (1931). Because of the approach taken in the District Court, however, there has been no definitive ruling on this issue. The court may have touched obliquely on the question when it declared, on a motion for clarification, that a State may not wholly exclude foreign corporations from doing business in the State. See App. to Juris. Statement E2. But it made no specific determination whether § 660.10 would have such an effect, and it refused to speculate about the impact that enforcement of the statute might have upon appellees.

Nor is it clear that there is a present case or controversy with respect to the validity of the separate requirements imposed by § 660.10. As we have noted, appellees' complaint does not expressly join battle on this issue. The facts of the case show, moreover, that it was § 659.141 (1) that prevented BTIM's entry into Florida. The application before the Board specified that BTIM would perform only investment advisory services that are outside the scope of § 660.10. Bankers Trust had not yet processed an application to the Board for permission to form a Florida trust subsidiary, and the Board had not yet determined whether such a subsidiary could be approved as a matter of federal law. The parties did stipulate that Bankers Trust would attempt to organize a Florida subsidiary having fiduciary powers were it not prohibited by state law from doing so. But we interpret this stipulation to mean that Bankers Trust was willing to comply with a local incorporation requirement, without contesting its validity, so long as it was not prohibited entirely from establishing a trust subsidiary in the State. Accordingly, the District Court may not have been in a position to decide the broad question the parties now ask us to resolve, even if that question had been clearly raised by the pleadings.

One further consideration counsels against our attempting to evaluate the validity of § 660.10 at this juncture. Since we noted probable jurisdiction of this appeal, Congress has

amended § 3 (d) of the Bank Holding Company Act to extend its restrictions on interstate expansion to fiduciary organizations of the kind Bankers Trust has stipulated it would attempt to organize in Florida. Depository Institutions Deregulation and Monetary Control Act of 1980, § 712 (b), Pub. L. 96–221, 94 Stat. 189 (Mar. 31, 1980).[14] It thus appears that Bankers Trust is presently prohibited by federal law from establishing a Florida trust subsidiary. This amendment is "repealed" by its own terms, § 712 (c), as of October 1, 1981, and there are indications in the legislative history that it was intended as a temporary moratorium on approval of trust company applications rather than as a prelude to more permanent restrictions. Nevertheless, we must review the judgment below in the light of both state and federal law as it now stands. See *Diffenderfer* v. *Central Baptist Church*, 404 U. S. 412, 414 (1972). This enactment raises new questions,

---

[14] This statute provides:

"Section 3 (d) of the Bank Holding Company Act of 1956 (12 U. S. C. § 1842 (d)) is amended by inserting (1) after (d) and by adding at the end thereof the following:

"(2) (A) Except as provided in subparagraph (B), the restrictions contained in paragraph (1) regarding the acquisition of shares or assets of, or interests in, an additional bank shall apply to the acquisition of shares or assets of, or interests in, a trust company.

"(B) Subparagraph (A) shall not apply with respect to the acquisition of shares or assets of, or interests in, a trust company if such acquisition was approved by the Board on or before March 5, 1980, and if such trust company opened for business and was operating on or before March 5, 1980.

"(C) For the purpose of this paragraph, the term 'trust company' means any company whose powers are limited to the powers specified in subsection (a) of the first section of the Act entitled 'An Act to place authority over the trust powers of national banks in the Comptroller of the Currency,' approved September 28, 1962 (12 U. S. C. § 92a), for a national bank located in the same State in which such trust company is located.

"(c) The amendments made by this section are hereby repealed on October 1, 1981."

both jurisdictional and substantive, that should be addressed in the first instance by the District Court.

For these reasons, we determine that the constitutionality of § 660.10's limitation on the types of corporations that may perform trust responsibilities is not properly before us at this stage in the proceedings.

## V

In summary, we affirm the judgment of the District Court insofar as it declares unconstitutional the challenged portions of § 659.141 (1) and enjoins their enforcement. We vacate that portion of the judgment that relates to the constitutionality of § 660.10, and we remand the case for such further proceedings as are appropriate and consistent with this opinion.[15]

*It is so ordered.*

---

[15] Florida's Regulatory Reform Act of 1976, 1976 Fla. Laws, ch. 76–168, § 3 (2) (t), repeals, as of July 1, 1980, chs. 659 and 660 of the Florida Statutes "relating to banking." These chapters include §§ 659.141 (1) and 660.10. Section 2 of ch. 76–168 recites that it is "the intent of the Legislature . . . [t]o provide systematic legislative review of [licensing and regulation of businesses] . . . by a periodic review and termination, modification, or reestablishment of such programs and functions."

We are advised that pending in the Florida Legislature at the present time are S. B. 347 and a House substitute for S. B. 347; that both bills leave the substance of §§ 659.141 (1) and 660.10 intact for the express purpose of not mooting out pending litigation; and that action on these bills will be taken before the legislature adjourns. As of the date this opinion is filed, §§ 659.141 (1) and 660.10 remain in effect so the case has not become moot, whatever the ultimate disposition of the pending bills.