*1184 Members of the Senate
Alabama State House
Montgomery, Alabama 36130
Dear Senators:
We have received Senate Resolution No. 72, requesting an opinion of the Justices as to whether the “Sanford Amendment,” which the Alabama Senate has adopted and which amends Senate Bill 121 (“S.B. 121”) now pending before the Alabama Legislature, would, if the constitutional amendment proposed by S.B. 121 is ratified, violate certain clauses of the United States Constitution.
The questions posed by Senate Resolution No. 72 are as follows:
“1. Does the Sanford Amendment to S.B. 121, or any part thereof, violate the commerce clause of the United States Constitution, Article I, Section 8, Clause 3?
“2. Does the Sanford Amendment to S.B. 121, or any part thereof, violate the privileges and immunities clause of the United States Constitution, Article IV, Section 2, Clause 1?
“3. Does the Sanford Amendment to S.B. 121, or any part thereof, violate the Equal Protection Clause of the United States Constitution, Fourteenth Amendment?”
S.B. 121 proposes an amendment to the Constitution of Alabama of 1901. The Sanford Amendment amends S.B. 121. S.B. 121, with the language added by the Sanford Amendment emphasized, reads, in pertinent part:
“Beginning in the fiscal year ending September 30, 2011 and continuing through the fiscal year ending September 30, 2020, the Legislature shall appropriate from the Alabama Trust Fund the amount of one hundred million dol *1185 lars ($100,000,000) in each fiscal year. The appropriation may be made in either the general appropriations act or a separate appropriations act, and the funds shall be distributed as provided in subdivisions 1 and 2 below. Not less than twenty-five percent of this amount shall be used for maintenance and repairs.
“(1) Seventy-five percent of the appropriation from the Alabama Trust Fund shall be distributed to the Department of Transportation for state highways, roads, and bridges and other transportation allocated as follows:
“a. At least five million ($5,000,000) of this amount shall be used in each congressional district in this state as these districts exist on the effective date of this amendment. For the fiscal year ending September 30, 2011 and 2012, the funds allocated to the Fifth Congressional district shall be further allocated to the City of Huntsville for infrastructure supporting the growth and expansion related to the Defense Base Closure and Realignment Commission (BRAC).
“b. One million ($1,000,000) of this amount shall be distributed to the Alabama Shortline Railroad Infrastructure Rehabilitation Fund established by Act No. 2008-382 in the 2008 Regular Session. These funds shall be granted in a manner which will enhance economic development and growth by providing for the proper rehabilitation and upgrading of shortline railroads. In order to be eligible to receive grant funds from this allocation an eligible grantee must provide matching funds equal to 20% of the amount of the grant award which shall be allocated for the same purposes for which the grant is made.
“c. The department shall not distribute any funds to any company or corporation providing transportation products or services unless the company or corporation certifies to the department that it is an Alabama based company or corporation employing only Alabama residents.
“(2) The remaining twenty-five (25%) shall be distributed to the counties and municipalities to be used for new construction and maintenance and repair. This amount shall be allocated as follows:
“a. Forty-five percent (45%) shall be allocated equally among the sixty-seven counties of the state.
“b. Fifty-five percent (55%) shall be allocated among the sixty-seven counties of the state on the basis of the ratio of the population of each county to the total population of the state according to the then next preceding federal decennial census.
“c. Ten percent of the total amount allocated to each county in accordance with subdivisions (2)a. and b. of this amendment shall be distributed among the municipalities within the county on the basis of the ratio of the population of each municipality to the total population of all municipalities in the county according to the then next preceding federal decennial census except that in the fiscal year ending September 30, 2011 and 2012, any funds allocated to Madison County under subsection (a) and (b) shall be further allocated to the City of Huntsville for infrastructure supporting the growth and expansion related to the Defense Base Closure and Realignment Commission (BRAC).

“d. A county or municipality shall not distribute any funds to any company or corporation providing transportation products or services unless the company or corporation certifies to the county or city that it is an Alabama 
*1186
based company or corporation employing only Alabama residents.

“Section 2. In order to compensate for the reduction in interest earnings to local governments due to the transfer of funds from the Alabama Trust Fund, the following additional transfers shall be made from the Alabama Trust Fund in each of the following fiscal years to be divided equally between the Municipal Government Capital Improvement Fund created in Code of Alabama 1975, Section 11-66-4 and the County Government Capital Improvement Fund created in Code of Alabama 1975, Section 11-29-4.
“FY 2011 — $1 million
“FY 2012 — $2 million
“FY 2013 — $3 million
“FY 2014 — $4 million
“FY 2015 — $5 million
“FY 2016 — $6 million
“FY 2017 — $7 million
“FY 2018 — $8 million
“FY 2019 — $9 million
“FY 2020 and each fiscal year thereafter — $10 million.

“Section 3. Each company awarded a contract funded by the proceeds from this amendment shall employ 50 percent of all new hires from state unemployment rolls. The unemployment roll hires shall have been on the rolls for a minimum of 26 weeks and shall be placed on the company payroll within 60 days of receiving project funds.”

In Opinion of the Justices No. 382, 907 So.2d 1022 (Ala.2005), this Court recognized:
“Section 12-2-10, Ala.Code 1975, provides that ‘... either house of the Legislature, by a resolution of such house, may obtain a written opinion of the justices of the Supreme Court of Alabama or a majority thereof on important constitutional questions.’ An advisory opinion is an opinion of the individual Justices signing the opinion; an advisory opinion is not issued by the Alabama Supreme Court acting in its judicial capacity and, therefore, is not binding precedent. Opinion of the Justices No. 381, 892 So.2d 375 (Ala.2004).
“In 1923, the members of the Supreme Court responded to the first request for an advisory opinion. The Justices considered the constitutionality of Act No. 43, Ala. Acts 1923, the Advisory Opinion Act, now codified at § 12-2-10, and stated:
“ ‘Interpreting the act according to its manifest effects, these conclusions must, of necessity prevail: (a) That the act does not at all contemplate the advice or the advisory opinions of the Justices upon any matter relating to the wisdom, desirability, or policy of prospective legislative or executive action; (b) that the merely advisory opinions contemplated are those of the individual Justices, not the Supreme Court of Alabama in its judicial capacity; (c) that specific inquiries, within the intent of the act, must involve or concern concrete, important constitutional questions upon matters or subjects of a general public nature, as distinguished from questions involved in the ascertainment or declaration of private right or interest; (d) and that responses to questions within the purview of the act are designed to be advisory, consultative only, not concluding or binding the Governor or the House or Houses propounding inquiries or the Justices responding thereto.’
“Opinion of the Justices No. 1, 209 Ala. 593, 594, 96 So. 487, 488-89 (1923).
*1187 “The Justices of the Supreme Court have consistently restricted advisory opinions to questions on the constitutionality of proposed legislation ‘arising under a stated section or sections of the Constitution.’ Opinion of the Justices No. 219, 294 Ala. 604, 605, 320 So.2d 622, 628 (1975)....
“Advisory opinions are ‘usually given in deference to the executive and legislative departments of the state in order to guide them in the proper dispatch of their duties and to protect the officers and departments of the state in the performance of their duties under enacted legislation.... ’ Opinion of the Justices No. 160, 266 Ala. 370, 371, 96 So.2d 752, 753 (1957). Advisory opinions are rendered ‘outside the normal adversary system wherein pertinent facts from the record of a trial court would be presented, and the issues would be briefed by attorneys and most times orally argued before the Court.’ Opinion of the Justices No. 289, 410 So.2d 388, 391-92 (Ala.1982). Because of the nature of advisory opinions, the Justices are limited to answering questions regarding the facial constitutionality of pending legislation.”
907 So.2d at 1024-25.
With these principles in mind, we consider the questions propounded by the Senate:
Question number 1 asks the members of this Court to determine whether the Sanford Amendment to S.B. 121 violates the Commerce Clause of the United States Constitution.
Initially, we must determine whether the State in the Sanford Amendment is seeking to affect commercial transactions as a “regulator” or as a “market participant.” The United States Supreme Court in Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), recognized that the Commerce Clause addresses mainly state taxes and regulatory measures blocking free, private trade in the national market and that it does not limit a state’s ability to operate in the free market. Thus, when a state enters the market as a participant it is not limited by the Commerce Clause. For example, in White v. Massachusetts Council of Construction Employers, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), the United States Supreme Court held that the City of Boston was acting as a market participant, not a regulator, when the city implemented a mayoral executive order providing that at least 50% of all construction projects funded in whole or in part by city funds must be performed by a workforce at least one-half of whom were residents of Boston. The United States Supreme Court held that the city was a market participant because the executive order did not restrict the operation of construction companies, it merely provided that if a company was awarded a construction project funded by the city, the company must employ a certain quota of Boston residents for the city-funded project. The United States Supreme Court reasoned that because the mayor’s executive order made the city a market participant, the Commerce Clause was not implicated.
Unlike the mayor’s executive order in White, which did not regulate the construction market and did not implicate the Commerce Clause, the Sanford Amendment appears to regulate the construction market. The Sanford Amendment provides that for a company or corporation to be awarded funds under the constitutional amendment proposed by S.B. 121 the company or corporation must certify that it is an “Alabama based company or corporation employing only Alabama residents.” The Sanford Amendment does not limit the company or corporation’s employ of *1188 Alabama residents to the projects funded by the constitutional amendment proposed by S.B. 121 but broadly provides that to be eligible to participate the company or corporation cannot employ any nonresident employees. It is of no effect that the nonresident employees are not working on the project funded by S.B. 121; the company or corporation cannot employ any nonresident employees to be eligible for funds under S.B. 121. Such broad language regulates the construction market by limiting whom a company or corporation can employ, regardless of whether the employee is working on a project funded by S.B. 121. Placing such a restriction on construction companies or corporations constitutes market regulation, not market participation.
Additionally, the Supreme Court in White held that the mayor’s executive order did not violate the Commerce Clause even though the projects were funded by both city and federal moneys. To reach this conclusion, the Supreme Court examined the applicable federal statutes and recognized that “if the restrictions imposed by the city on construction projects financed in part by federal funds are directed by Congress then no dormant Commerce Clause issue is presented.” 460 U.S. at 213, 103 S.Ct. 1042. The Supreme Court held that “the federal regulations for each program affirmatively permit the type of parochial favoritism expressed in the order.” Id.
Because the question presented rests merely upon the language of the Sanford Amendment to S.B. 121 and does not indicate whether funding for the anticipated transportation-infrastructure projects will also be provided by federal, private, or other moneys, we cannot discern whether the Sanford Amendment is violative of the Commerce Clause in this regard.
Because we conclude that the State, in light of the broad language of the Sanford Amendment, is regulating the market rather than merely participating in it, we must determine whether the Sanford Amendment places a burden on interstate commerce that is permitted by the Commerce Clause.
In Maine v. Taylor, 477 U.S. 131, 137-38, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), the United States Supreme Court stated:
“The Commerce Clause of the Constitution grants Congress the power ‘[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.’ Art. I, § 8, cl. 3. ‘Although the Clause thus speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade.’ Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 35 (1980).... The limitation imposed by the Commerce Clause on state regulatory power ‘is by no means absolute,’ and ‘the States retain authority under them general police powers to regulate matters of “legitimate local concern,” even though interstate commerce may be affected.’ Id., at 36.
“In determining whether a State has overstepped its role in regulating interstate commerce, this Court has distinguished between state statutes that burden interstate transactions only incidentally, and those that affirmatively discriminate against such transactions. While statutes in the first group violate the Commerce Clause only if the burdens they impose on interstate trade are ‘clearly excessive in relation to the putative local benefits,’ Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970), *1189 statutes in the second group are subject to more demanding scrutiny. The Court explained in Hughes v. Oklahoma, 441 U.S. [322], 336 [ (1979) ], that once a state law is shown to discriminate against interstate commerce ‘either on its face or in practical effect,’ the burden falls on the State to demonstrate both that the statute ‘serves a legitimate local purpose,’ and that this purpose could not be served as well by available nondiscriminatory means. See also, e.g., Sporhase v. Nebraska ex rel. Douglas, 458 U.S. 941, 957 (1982); Hunt v. Washington State Apple Advertising Comm’n, 432 U.S. 333, 353 (1977); Dean Milk Co. v. Madison, 340 U.S. 349, 354 (1951).”
The United States Supreme Court has made it clear that railroads, highways, and bridges constitute instrumentalities of interstate commerce that Congress can regulate under the Commerce Clause. The Shreveport Rate Cases, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914) (railroads); Alstate Constr. Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745 (1953) (highways); Overstreet v. North Shore Corp., 318 U.S. 125, 129, 63 S.Ct. 494, 87 L.Ed. 656 (1943) (intrastate bridge over navigable waters).
The Sanford Amendment requires that the funds provided in the constitutional amendment proposed by S.B. 121 for the construction, maintenance, and repair of state highways, roads, bridges, and railroads be distributed to “Alabama based companies] or corporation^] employing only Alabama residents.” Such language on its face discriminates against interstate trade by providing differential treatment between in-state businesses and out-of-state businesses desiring to work on state highways, roads, bridges, and railroads. In-state businesses are benefited; out-of-state businesses are burdened. Therefore, we conclude that the Sanford Amendment affirmatively discriminates. Our inquiry, however, does not end here.
“Discriminatory laws motivated by ‘simple economic protectionism’ are subject to a ‘virtually per se rule of invalidity,’ Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978), which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose, Maine v. Taylor, 477 U.S. 131, 138 (1986).”
United Haulers Ass’n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338-39, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007). Therefore, we must determine whether the Sanford Amendment serves a “legitimate local purpose” that “cannot be served as well by available nondiscriminatory means.” Maine, 477 U.S. at 138, 106 S.Ct. 2440.
In today’s economic climate with the State of Alabama’s high rate of unemployment, it is easy to discern that the Sanford Amendment attempts to fulfill a “legitimate local purpose,” namely, providing jobs for Alabama’s citizens. Indeed, this State has a vested interest in having its citizens employed. However, it is equally true that the employment of Alabama’s citizens can be achieved through other reasonable nondiscriminatory means that do not interfere with interstate commerce. For example, the constitutional amendment proposed by S.B. 121, without the Sanford Amendment, would, as a practical matter, if ratified, cause substantial sums of money to be spent throughout Alabama and thereby promote Alabama businesses and employees to a degree sufficient to qualify as an alternative means to further local interest without a discriminatory impact on interstate commerce. Therefore, because we can envision means of providing jobs for Alabama’s citizens that achieve a “legitimate local purpose” and are nondiscriminatory, we conclude that the Sanford Amendment violates the Commerce Clause of the United States Constitution.
*1190 We therefore answer question number 1 in the affirmative. Because the answer to question number 1 is dispositive, we need not address whether the Sanford Amendment is also violative of the Privileges and Immunities Clause or the Equal Protection Clause of the United States Constitution. We, therefore, respectfully decline to answer questions number 2 and 3.
QUESTION NUMBER 1 ANSWERED; QUESTIONS NUMBER 2 and 3 DECLINED.
Respectfully Submitted,
/s/ Sue Bell Cobb Sue Bell Cobb Chief Justice
/s/ Champ Lyons, Jr. Champ Lyons, Jr.
/s/ Thomas A. Woodall Thomas A. Woodall
/s/ Lyn Stuart Lyn Stuart
/s/ Patricia M. Smith Patricia M. Smith
/s/ Michael F. Bolin Michael F. Bolin
/s/ Tom Parker Tom Parker
/s/ Greg Shaw Greg Shaw Associate Justices
Members of the Senate
Alabama State House
Montgomery, Alabama 36130
Dear Senators:
I have received Senate Resolution No. 72, requesting an advisory opinion as to whether the “Sanford Amendment,” which amends Senate Bill 121, would violate, among other provisions, the Commerce Clause of the United States Constitution. The other Justices in an advisory opinion issued today have determined that it would. I decline to answer the question.
I am not persuaded that the distinction the advisory opinion of the other Justices seeks to draw between the type of entities with which the government chose to deal in White v. Massachusetts Council of Construction Employers, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), and the type of entities with which the government would choose to deal here makes a difference to the reasoning and holding of White. I therefore have declined to join in the advisory opinion concerning the Commerce Clause signed today by the other members of this Court.
QUESTIONS DECLINED.
Respectfully Submitted,
/s/ Glenn Murdock Glenn Murdock Associate Justice