**LORETTO WINERY LTD. and R M R Wine Distributors Corp., Plaintiffs,**

v.

**Anthony V. GAZZARA, Chairman, Hugh B. Marius, Robert Doyle, Terrence Flynn and Frederick T. Pannozo, as Commissioners of the State Liquor Authority, Division of Alcoholic Beverage Control, State of New York, Defendants,**

**The New York State Wine Grape Growers, Inc. and New York State Food Merchants Association, Inc., Defendant-Intervenors.**

No. 84 Civ. 6024–CLB.

United States District Court,
S.D. New York.

Jan. 30, 1985.

Martin Mehler, Mehler & Buscemi, New York City, for plaintiffs.

Andrea Green, Asst. Atty. Gen., New York City, for defendants.

Samuel Bernstein, New York City for defendant-intervenor New York State Wine Grape Growers, Inc.

Terrence P. O'Reilly, Foley, Hickey, Gilbert & O'Reilly, New York City, for defendant-intervenor New York State Food Merchants Ass'n, Inc.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

In the present action, this Court has been asked to examine the constitutionality of certain provisions of the New York Alcoholic Beverage Control Law ("ABC Law"). Plaintiff,[1] alleging the absence of any genuine issue of material fact, moves pursuant to Rule 56, F.R.Civ.P. for an order declaring Section 3, subdivisions 36-a and 79-a of the aforementioned statute unconstitutional and enjoining defendants from enforcing those provisions. Defendants also move for summary judgment in their favor, asserting that the legislation is constitutional as a matter of law.[2]

The provisions of the ABC Law at issue herein became effective July 24, 1984, and provide in substance that the sale of a newly defined "wine product" in retail grocery stores pursuant to a license, a practice not allowed previously in New York State, would now be permitted. N.Y.Alc.Bev. C.L., Section 79-a. The law defines "wine product" as a beverage containing *inter alia*, "*wine produced exclusively from grapes grown in New York State* and containing not more than six percentum alcohol by volume." (Emphasis added). N.Y. Alc.Bev.C.L., Section 3, subdivision 36-a.[3]

Thus, although locally grown grapes can be integrated with other ingredients to produce a "wine product" for sale in licensed retail grocery stores, the prior ban against the sale in retail grocery stores of any wine products remains intact as to items made wholly or in part from grapes grown outside the State of New York.

Generally wines are sold in "package stores" licensed to do so, which do not sell groceries or non-alcohol related products. New York has less than 4,500 package stores, compared to about 23,000 retail grocery stores, so the opportunity to sell a wine product in a grocery invites far greater market penetration with resulting significant advantage to the product made with New York grapes.

Plaintiff Loretto Winery Ltd. is a California corporation with its principal place of business in that State. It is engaged in the business of producing and selling wines and wine products made, at least in substantial part, from grapes grown in the State of California. Among the beverages produced and sold by plaintiff is a "California Special Wine Cooler," a wine product sold in forty states and containing six centum of alcohol. (Affidavit of Dominic Scotto, October 15, 1984, at 1-2). This product, it is conceded by defendants, is not chemically different from the newly authorized New York "wine product." (Transcript of September 6, 1984, at 7).

Plaintiff has previously taken steps to have its wine product sold in New York in package stores, but, until recently, had been prevented from doing so due to its

---

1. Plaintiff RMR Distributors Corp. was heretofore dismissed by the Court as a party to this action due to lack of standing. All references are to the sole remaining plaintiff, Loretto Winery Ltd.

2. This Court has previously granted the applications of the New York State Wine Grape Growers, Inc. ("NYSWGG") and the New York State Food Merchants Association, Inc. ("NYSFMA") to intervene in this action as defendants. See Rule 24(b), F.R.Civ.P. Submissions by the intervenors have been received and considered for the present motions.

3. Subdivision 36-a also provides that the "wine product" must contain "concentrated or unconcentrated juice, flavoring material, water, citric acid, sugar and carbon dioxide." The product is hardly a new invention, although new to the New York market at this level of alcoholic content.

failure to comply with certain state labelling requirements. *Id.* at 2. However, prior to commencement of this action, the New York State Liquor Authority granted its approval for the sale by plaintiff of its wine product in New York package stores. (See Statement of Defendants submitted pursuant to Rule 3(g) of the Civil Rules of the United States District Court for the Southern District of New York, at 5). Plaintiff continues to be prevented, by reason of the 1984 amendments, from selling its wine product in New York's retail grocery stores. This is solely because it does not use 100% grapes grown in New York.

Plaintiff charges that the 1984 amendments to the ABC Law are unconstitutional under the interstate commerce clause. *U.S. Const.*, art. I, § 8, cl. 3.[4] Specifically, plaintiff contends that the amendments unlawfully discriminate against, and unduly burden, interstate commerce in grapes and grape products, and that as a result of the ban against the sale of its California wine product in New York grocery stores, plaintiff will suffer severe and irreparable injury in the form of lost revenue. Plaintiff further asserts that it has no adequate remedy at law. (Amended Complaint, at 6–8).

In contrast, defendants contend that the challenged provisions of the ABC Law comply with applicable constitutional requirements. Moreover, argue defendants, even though the ABC Law may offend the commerce clause, the Twenty-first or Repeal Amendment of the Constitution left to the states broad powers to regulate the sale or use of alcoholic beverages within their borders, including the authority to enact legislation limiting the sale of wine products in retail grocery stores to those produced exclusively from grapes grown within the State.

A brief review of the history of National Prohibition and the prohibition movement is essential. This effort reached its culmination in the ratification of the Eighteenth Amendment, effective January 1, 1920, and declined markedly after that Amendment was repealed in 1933. We consider below the background of the Twenty-first Amendment and the extent to which it conferred upon the states the power, after repeal of National Prohibition, to regulate the sale or use of intoxicating liquors in interstate commerce.

I

The roots of prohibition at the national level in this country date back before the founding of the Prohibition Party in 1869. The prohibitionists, comprised mostly of people living on the farms and in country towns, believed that alcohol constituted a grave threat to the moral fiber of the public in the United States and had to be stamped out.[5] Though the movement did gain public support, its initial achievement was in creating support of principles, rather than having any practical impact. Thus the early effort to achieve prohibition proved largely ineffective. Then, just four years after the inception of the Prohibition Party, the Women's Christian Temperance

---

4. In addition, plaintiff alleges that the amended ABC Law constitutes an unreasonable burden on foreign commerce. This Court has been presented with no evidence supporting this latter contention and plaintiff does not use foreign grapes. Accordingly the issue of whether the legislation places an unconstitutional burden on foreign commerce need not be addressed.

5. Although the Prohibition Movement in this country was of relatively recent origin, the evils of alcohol had long been perceived:

"Who hath woe? who hath sorrow? who hath contentions? who hath babbling? who hath wounds without cause? who hath redness of eyes?

They that tarry long at the wine; they that go to seek mixed wine.

Look not thou upon the wine when it is red, when it giveth his colour in the cup, when it moveth itself aright.

At the last it biteth like a serpent, and stingeth like an adder.

Thine eyes shall behold strange women, and thine heart shall utter perverse things.

Yea, thou shalt be as he that lieth down in the midst of the sea, or as he that lieth upon the top of a mast.

They have stricken me, shalt thou say, and I was not sick; they have beaten me, and I felt it not; when shall I awake? I will seek it yet again." *Proverbs* 23:29–35.

Union ("WCTU") was founded. This organization, building upon the foundation laid by the Prohibition Party, drew the support of women in a nationwide effort not only to gain support for prohibition, but also to elect government officials dedicated to "local option," a 19th century practice by which communities voted themselves "Dry." The WCTU also favored the enactment and enforcement of legislation that would restrict the interstate flow of liquor throughout the United States. F. Dobyns, *The Amazing Story of Repeal* (1940) at 229–30. The WCTU, like the Prohibition Party, was not immediately successful in achieving its objectives. Both organizations, however, did succeed in keeping the prohibition movement alive and created a social climate that would later be conducive to gaining substantive changes in the laws.

Those changes came closer in 1893 with the formation of the Anti-Saloon League. For the very first time those advocating prohibition of unrestricted liquor traffic were able to gain the support of a wide cross-section of the population, including businessmen, and various church groups, university faculties and political parties.[6] Acting together, the members of the Anti-Saloon League proved so successful that by the year 1919 the group had played a pivotal role in persuading the legislatures of over thirty-three states to enact "dry laws" restricting the local liquor traffic. Along the road, recognizing that since the time of the Whiskey Rebellion (1794), the United States treasury had depended principally on the excise tax on alcohol, the Prohibitionist movement supplied the political impetus to give us the Federal Income Tax, supporting the enactment of the Sixteenth Amendment, effective February 25, 1913. It was their hope that creating this new unbounded source of federal revenue would make the enactment of National Prohibition easier, and it probably did.

The Prohibition movement in the United States peaked in 1919 with the ratification of the Eighteenth Amendment to the United States Constitution. That Amendment provided in relevant part:

"Section 1. After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited.

Section 2. The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation."

Little did the proponents realize at the time that their achievement of the goal toward which they had worked for more than half a century would also signify the beginning of the demise of the organized temperance movement in this country. The weakness in the Eighteenth Amendment and the Volstead Act, passed to enforce it, became apparent immediately after ratification. Indeed, some of the defects were so obvious that in retrospect they may have been the product of intentional libertarian sabotage. Most important of these weaknesses was the fact that the Amendment and the implementing legislation did not prohibit the consumption or use of alcoholic beverages, nor their mere possession. Also, the one-year delay in the effective date of prohibition created the justified impression of class bias; for a man of wealth was furnished the opportunity to "spend a year building up his cellar while the poor man, about to be deprived of his beer and his saloon at one and the same time, could only sit and wait for the terrible day to come." D.B. Chidsey, *On and Off the Wagon* (1969) at 73. Additionally, it became apparent during the interim one-year period that some people were simply not going to accept this intrusion into their personal life-style lying down:

6. The Anti-Saloon League, in order to gain widespread support, had, during its tenure, printed some 100 million flyers, posters and pamphlets in order to spread its word that alcohol was responsible for the observed decay in health and morals throughout the United States. S. Morison, *The Oxford History of the American People* (1965) at 900.

"There was a rash of warehouse robberies. The government doubled the guards, but the robberies multiplied and millions of gallons of bonded whiskey were carted away. There were also burglaries at the estates of men who were known to have built up large stocks of wine and liquor. Yet nobody dreamed that the age of hijacking was beginning. The word itself had been known in the underworld at least as far back as 1890, but it was not widely used because hijacking had not been widely practiced. That would soon be changed." *Id.* at 73–74.

After prohibition took effect in 1920, the nation's thirst for alcohol failed to subside. Indeed, consumption increased. The public became intrigued with alcohol and drinking because the sale of booze was forbidden. Average law abiding citizens frequented the night clubs and speakeasies which flourished during the decade. "By 1929 it was estimated that there were 219,000 speakeasies in the United States, 32,000 of which were in New York City." F.W. Board, Jr., *America and the Jazz Age. A History of the 1920's* (1968) at 71. Bootlegging became a national industry. Not surprisingly, with the profit to be made in bootlegging, smuggling of liquor over and indeed under the borders with Canada and Mexico and by a flotilla of all sorts of vessels into the United States also became rampant. Moreover, because the Amendment and supporting federal legislation prohibited only the sale of intoxicating liquors for "beverage purposes," sale and use of liquor for "medicinal purposes" expanded to all parts of the country. Thus was created an unlikely source for alcohol; the beloved family doctor.

A historian wrote:

"A ... tragic result was the fact that large numbers of normally honest and law-abiding physicians and druggists felt that the [prohibition] law was so drawn that its violation was forced upon them. Their success depends not alone upon their skill, but also upon their good will. If a man asked for a liquor prescription, it was the duty of the physician to refuse it unless he honestly believed that the man was suffering from 'some known ailment' for which an alcoholic beverage was a proper remedy. He knew, however, that if he took this course, the man would not only resent it but also go to some more accommodating physician for his liquor supply. He feared that he would not only lose the money which he would have received for the liquor prescription, which he was willing to do, but that he would also lose the man's legitimate patronage, which he was unwilling to do. So he said to himself, 'Well, he will get his liquor anyway, and I am not going to sacrifice my practice to a sentimental and futile obedience to a foolish law.' and he lapsed to the status of a bootlegger." F. Dobyns, *The Amazing Story of Repeal* (1940) at 291.

Add to the availability of prescription liquor a statutory exemption for sacramental wine, the ready availability of denatured ethyl alcohol for manufacturing and hospital use, which could be recooked and diverted into bootleg channels, as well as pure alcohol used in foods, medicines and flavoring extracts. Most freedom loving families made "home brew" in the basement and gin in the bathtub. Non-alcoholic "flavor drops" and non-alcoholic grape and malt products were sold freely in the neighborhood drug and grocery stores. These, alone or together with raisins, prunes, corn middlings, wheat, apples, molasses or plain white sugar could be fermented in water wherever the wild yeast is borne on the wind, which is everywhere. Such items as a worm and a poofer box could readily be added to a home heating system or erected outdoors in the hills to make whiskey, rum, or "white lightning." Under contemporary slang the expression to "strike a blow for freedom" became, overnight, a part of the language as a euphemism for pouring a drink.

Last, but by no means least, the "Noble Experiment"[7] was assured of failure because the Amendment gave concurrent enforcement powers to state and federal authorities. Everybody's business soon became nobody's responsibility. The state and local officials had more important work to do than enforce this unpopular law, and looked to the federal government. The latter removed Prohibition cases from the regular federal law enforcement agencies and entrusted the work to special agents, appointed for the purpose and underpaid. Meager salaries seemed only to encourage the corruption of these individuals:

"In the cities ... the agents tended to favor certain speakeasies. They would eat well and drink well, sometimes lingering all day, and they would fill their pockets with cigars, but they never offered to pay a bill or leave a tip. The proprietor usually hated them, but he kowtowed to them lest he be raided. If there were other services connected with the speakeasy ... the agents never failed to avail themselves for free." D.B. Chidsey, *On and Off the Wagon* (1969) at 87.

With an abundant supply of liquor throughout the United States, and the eagerness of a majority of the adult population to purchase that alcohol, it soon became clear that enforcement of the prohibition laws would never be successful. As a consequence, and because the descendants of those who burned the Peggy Stewart (1774) are never far from refusing to obey an unjust law, it soon became apparent that National Prohibition, totally ineffective and unenforceable over a period of thirteen years, would have to be brought to an end.

It was.

Against this background, the Twenty-first Amendment to the Constitution of the United States was ratified by the legislatures of two-thirds of the several states, and on December 5, 1933, National Prohibition was repealed.

We describe in such detail the history of the Noble Experiment, not solely out of nostalgia or a fascination with our political history in this great nation, but in order to establish the historical background against which, first the Eighteenth and then the Twenty-first Amendments to the Constitution were put in place. Prior to the enactment of the Eighteenth Amendment, more than thirty-three states had enabling legislation for local option, whereby communities were allowed to vote "Dry" and free themselves from the perceived perils of the liquor trade. To preserve this form of local option, and to restore the regulatory powers which the states had exercised in this area prior to 1920, Section 2 of the Twenty-first Amendment was adopted, reading as follows:

"Section 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxication liquors, in violation of the laws thereof, is hereby prohibited."

In the case at bar the issue is whether the interstate commerce clause is to be applied so as to invalidate the 1984 amendments to New York's ABC Law despite the fact that the legislation regulates delivery or use in New York of intoxicating liquors, a subject over which the states were granted broad regulatory powers under Section 2 of the Twenty-first Amendment.

## II

 It is undisputed that the wine product manufactured by plaintiff is an article of interstate trade and by definition merits protection under the commerce clause, as do California grapes. *See City of Philadelphia v. New Jersey*, 437 U.S. 617, 622, 98 S.Ct. 2531, 2534, 57 L.Ed.2d 475 (1978). The traditional principles underlying the clause operate not only as a grant to Congress of power to regulate interstate commerce, but also as a restriction on the authority of the states to regulate interstate trade. *Lewis v. BT Invest-*

---

**7.** President Herbert Hoover, who had some difficulty in deciding whether he was a Wet or a Dry, coined this expression for National Prohibition.

*ment Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). This does not mean, however, that the states are absolutely barred from erecting certain barriers to interstate trade. Indeed, absent federal preemption of a specific subject matter, the states may, in the exercise of their police power, regulate matters of "legitimate local concern" even though such regulation may have a concomitant effect upon interstate commerce. *Id.* at 36, 100 S.Ct. at 2015. Thus, in those situations where the state acts evenhandedly to promote a legitimate local concern such as protecting the environment, and the effect upon interstate commerce is merely incidental, the state regulation will be upheld unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). If, on the other hand, a state enacts legislation that does not regulate evenhandedly, but discriminates against out-of-state products solely because of their origin, the importance of the state interest involved in largely irrelevant; "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *City of Philadelphia, supra,* 437 U.S. at 624, 98 S.Ct. at 2535.

Our inquiry, therefore, must focus on whether New York's amended ABC Law "is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns with effects upon interstate commerce that are only incidental."

By an official Memorandum signed by the Governor of New York and filed with the proposed 1984 amendments to the ABC Law, the legislative purpose was candidly described as follows:

> "*These bills promote the sale of, and expand the market for, New York State labelled wines.*
>
> As I stated in my 1984 Annual Message to the Legislature, the difficulties of the New York wine and grape industry required statutory changes to expand the industry's market opportunities. These bills will provide significant assistance to the industry which is extremely important to New York State.
>
> Senate bill number 9907 reduces restrictions on the promotion and marketing of New York labelled wines; Senate bill numbers 9906 and 10103 authorize wineries to conduct tastings of New York labelled wines in liquor stores; and Assembly bill number 7531 authorizes wineries in the State to make wine deliveries on behalf of other wineries in the State. The wine industry and I are convinced that if the public is encouraged to try New York wines, the wines will sell themselves. These measures enhance the ability of New York wine producers to introduce their products to the consumer.
>
> Senate bill numbers 9973 and 10132 authorize the sale of New York wine products, a low alcohol combination of fruit juice and wine, in grocery stores for a two year period. Although the bill will aid New York wine producers, it will also allow the State to evaluate the sale of wine products in grocery stores. *Because domestically produced wine products are licensed and regulated from the winery to the shelf, it is appropriate that this two year experiment involve only those tightly controlled products.*" (Defendant's Notice of Cross-Motion, Ex. F) (emphasis added).

In addition to those purposes stated in the Memorandum, this Court will also accept as true for purposes of this motion, that the State of New York, in limiting the alcohol content of the "wine product" to 6%, was pursuing a goal of promoting temperance. See Memorandum of NYSFMA, at 4. Also, by making the newly authorized beverage available in grocery stores, more numerous and more frequented by the public than package stores, the convenience of the public was served.

Under traditional commerce clause jurisprudence, it is beyond dispute that the ABC Law would be unconstitutional, as discriminatory in both its purpose and its effect.

The central purpose of the statutory package was admittedly to promote the sale of "New York labelled wines." This is plain and simple economic protectionism of New York grown grapes, at the expense of out of state grapes, and a violation of the commerce clause of the most simple and direct kind. Although there may be the ancillary purposes of conducting an "experiment" for two years, or promoting temperance, it is clear that the 1984 amendments were primarily designed to aid local industry. The effect of this was to place out-of-state producers of grapes, whose goods could be sold only in the less numerous package stores, at a significant competitive disadvantage. As a direct result of the measures taken to protect the local grape industry, plaintiff has been barred from a substantial number of outlets from which it could sell its product, *i.e.*, New York retail grocery stores, which number at least 23,-000.

The legislative process often responds to hidden agendas of the sponsors and proponents. Sometimes ignorance intrudes into bill drafting. Deception is not unknown. In the words of W.S. Gilbert: "Things are seldom what they seem; skim milk masquerades as cream."[8] Although the Governor's Memorandum quoted above cites as an advantage that since "domestically produced wine products are licensed and regulated from the winery to the shelf it is appropriate that this ... experiment involve only those tightly controlled products," this advantage was never legislated as part of the statute, and is *not* effected by the amendment as drawn, nor as applied. Nowhere is there a legal requirement found that this new "tightly controlled" product come from a New York regulated *winery*. It can come from any winery; indeed it probably could be made in a brewery. The statute merely requires that the beverage contain "wine produced exclusively from grapes grown in New York State." This means grapes, or grape juice or crushed grapes may be sent from New York vineyards to any place to be fermented, packaged, mixed with the other required ingredients and returned to New York for sale. Indeed, this is what is now being done. New York wine and grape products are regularly shipped to lower cost locations for fermenting, blending and packaging, and returned to New York for sale. Even Seagram's Distillers, which owns one of the largest and most successful New York wineries (Taylor Wine Co.) ships its 100% New York grape ingredients to Milwaukee, Wisconsin for manufacture of the wine cooler product. See ¶ 8 of Affidavit of Samuel Bernstein, docketed October 12, 1984. New York grapes and/or wine are also shipped to Missouri, Maryland "and probably to California" for processing into the wine product. *Id.* at ¶ 8. So much for "tightly controlled" licensing and regulation "from the winery to the shelf."

Because the legislation is so underinclusive, and because on its face and also as applied it does *not*, as claimed, serve an arguable purpose under the police power of the state that the product be "tightly controlled" by the state "from the winery to the shelf," no justification for this burden on interstate commerce can be demonstrated based on ease of control.[9]

Defendants' reliance upon the case of *Minnesota v. Clover Leaf Creamery*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) is misplaced. See Memorandum of NYSWGG, at 10–11. There the State of Minnesota, to protect the environment and preserve solid waste disposal sites, prohibited the retail sale of milk in plastic non-returnable, non-refillable containers. At the same time, however, non-returnable, non-refillable containers were permitted to be utilized for products other than milk. *Id.* at 458, 101 S.Ct. at 721. The Court, in upholding the statute's validity under the

---

**8.** Pinafore, Act II (1878).

**9.** This Court expresses no opinion, by implication or otherwise as to whether the statute would have been constitutional if the wine product were required to be fermented, compounded and bottled in New York from New York grapes, so that it would be a "tightly controlled" product. But controlled against what?

commerce clause, found that the statute regulated evenhandedly by prohibiting sales of *all* milk sold in plastic, non-returnable containers and that the burden was not based on the origin of the milk. The burden on interstate milk was no greater than that on local milk, and the burden on interstate commerce was at most incidental. *Id.* at 471, 101 S.Ct. at 727. In contrast, the New York ABC Law in effect excludes for sale in retail grocery stores any 6% wine product not produced exclusively from New York grapes. Only those firms that sell wine products from 100% New York grapes may reap the benefits of easier market access allowed by the new legislation. As a result, growers and packagers of foreign grapes are placed at a competitive disadvantage. Persons who might otherwise purchase plaintiff's wine product, sold only at a liquor store, may now purchase an equivalent product containing 100% New York grapes, at the more convenient and more numerous retail grocery stores. Inasmuch as the legislation does not regulate the product of local and out-of-state grapes evenhandedly, the decision in *Clover Leaf Creamery* is not applicable to the case at bar.

As a result of this Court's conclusion that the ABC Law is discriminatory not only in its "legislative ends," but also in the means chosen, *see City of Philadelphia, supra,* 437 U.S. at 626, 98 S.Ct. at 2537, it is clear that the normal operation of the interstate commerce clause forbids the states from enacting legislation such as this.

### III

Defendants argue that the Twenty-first Amendment permits such discrimination when, as here, the subject matter involved is intoxicating liquors. (Transcript of Proceedings, October 12, 1984, at 23). We turn now to that argument.

As noted earlier, *supra* p. 856, the language of the Twenty-first Amendment and its legislative history demonstrate that Section 2 of the Amendment was intended to restore to the states the authority to promulgate local option temperance related controls concerning the sale and distribution of alcoholic beverages within their borders, as they had done prior to the Noble Experiment.

In the period immediately following its ratification, in *State Board of Equalization of California v. Young's Market Co.,* 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38 (1936), the Supreme Court first examined the interplay between the Twenty-first Amendment and the commerce clause. In that case, the State of California imposed a license fee of $500.00 for the privilege of importing beer into that State. Plaintiffs, corporations and individual citizens of California who sold beers imported at wholesale, challenged the imposition of the fee on the ground that it discriminated against sellers of imported beer in violation of both the equal protection and commerce clauses of the Constitution. Defendants, state officials charged with the duty to enforce compliance with the licensing statute, asserted that the statute was constitutional under the powers granted the states by the Twenty-first Amendment. *Id.* at 60–61, 57 S.Ct. at 77–78.

Writing for the *Young's Market* court, Justice Brandeis took an extremely broad view of the Amendment, and, finding the language unambiguous, refused to examine the legislative discussions which led to ratification. *Id.* at 63–64, 57 S.Ct. at 78–79. Instead, said the Court, the Amendment's prohibition against the " 'transportation or importation' of intoxicating liquors into any state 'in violation of the laws thereof,' abrogated the right to import free, so far as concerns intoxicating liquors." *Id.* at 62, 57 S.Ct. at 78. Moreover, the Court opined in *dicta* that its interpretation of the Amendment should be applied in all cases where the state has enacted legislation concerning the sale of intoxicating liquors:

"The words used are apt to confer upon the State the power to forbid all importations which do not comply with the conditions which it prescribes. The plaintiffs ask us to limit this broad command. They request us to construe the Amend-

ment as saying, in effect: The State may prohibit the importation of intoxicating liquors provided it prohibits the manufacture and sale within its borders; but if it permits such manufacture and sale, it must let imported liquors compete with the domestic on equal terms. To say that, would involve not a construction of the Amendment, but a rewriting of it." *Id.* at 62, 57 S.Ct. at 78.

Just three years after *Young's Market*, the Supreme Court repeated its admonition that the Twenty-first Amendment was not to be limited by the interstate commerce clause:

"The Twenty-first Amendment sanctions the right of a State to legislate concerning intoxicating liquors brought from without, unfettered by the Commerce Clause. Without doubt, a State may absolutely prohibit the manufacture of intoxicants, their transportation, sale or possession, irrespective of when or where produced or obtained, or the use to which they are to be put. Further, she may adopt measures reasonably appropriate to effectuate these inhibitions and exercise full police authority in respect of them." (Citations omitted). *Ziffrin, Inc. v. Reeves*, 308 U.S. 132, 138, 60 S.Ct. 163, 167, 84 L.Ed. 128 (1939).

Defendants contend that because the ABC Law concerns intoxicating liquors, the reasoning utilized by the Supreme Court in *Young's Market* and *Ziffrin, Inc.* is equally applicable to the case at bar. *See* Memorandum of Defendants, at 9–10; *see also*, Memorandum of NYSWGG at 6; Memorandum of NYSFMA at 6. In addition, they argue that even if the language of those two cases has been limited by subsequent decisions of the Supreme Court, the interests of the State of New York in enacting the 1984 amendments to the ABC Law are such that they militate against a finding that the amendments are unconstitutional. *See* Memorandum of Defendants at 11–12.

However, with the flow of history, just as the beer of yesteryear has lost its strength and flavor, the broad language of both *Young's Market* and *Ziffrin, Inc.* has been diluted in subsequent decisions by the Court. More recent cases have demonstrated an unwillingness on the part of the Supreme Court to allow a state legislature to conduct a trade war against another state, contrary to the principles underlying the commerce clause, simply because the product discriminated against is an alcoholic beverage subject to regulation under the Twenty-first Amendment.

■ It is now clear that that Court no longer considers the power of the states under the Twenty-first Amendment to be "unfettered by the Commerce Clause." Although the state authority to regulate the importation or transportation of intoxicating liquors remains broad, *see, e.g., Seagram & Sons v. Hostetter*, 384 U.S. 35, 42, 86 S.Ct. 1254, 1259, 16 L.Ed.2d 336 (1966), and such authority is still said to be "totally unconfined by traditional Commerce Clause limitations," *Hostetter v. Idlewild Liquor Corp.*, 377 U.S. 324, 330, 84 S.Ct. 1293, 1297, 12 L.Ed.2d 350 (1963), the Court has announced that the Commerce Clause must still be considered even if it is determined that a specific state regulation falls within the scope of the powers conferred upon the states under the Twenty-first Amendment: "Both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interest at stake in any concrete case." *Hostetter v. Idlewild Liquor Corp., supra*, at 332, 84 S.Ct. at 1298. From these cases, it is apparent that the *per se* approach suggested by Justice Brandeis that simply because alcoholic beverages are involved, a state statute that is patently discriminatory may stand, has now been abandoned in favor of a balancing approach when the powers of the state under the Twenty-first Amendment are implicated. *Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (the balancing test is to be a "pragmatic effort to harmonize state and federal powers"); *see also Bacchus Imports, Ltd.*

v. *Dias*, —— U.S. ——, 104 S.Ct. 3049, 3058, 82 L.Ed.2d 200 (1984); *Capital Cities Cable, Inc. v. Crisp*, —— U.S. ——, 104 S.Ct. 2694, 2708, 81 L.Ed.2d 580 (1984). As noted by Judge Winter, dissenting in *Battipaglia v. New York State Liquor Authority*, 745 F.2d 166, 180 (2d Cir.1984), *pet. for cert. filed* December 13, 1984, 53 U.S.L.W. 3509, "[T]he twenty-first amendment was plainly designed only to allow the states to legislate against the evils of intoxicating liquors rather than to reward its purveyors." In other words, the powers reserved must be exercised with temperance as their goal.

Accordingly, what is to be balanced is the state interest in promoting "temperance" with the federal constitutional interest in free trade across state lines. Only those state restrictions which directly promote temperance may now be said to be permissible under Section 2 of the Twenty-first Amendment.

In *Capital Cities Cable, Inc., supra*, the state of Oklahoma prohibited the retransmission of out-of-state alcoholic beverage commercials by cable television systems operating in the State. The Court noted that traditional constitutional analysis would require invalidation of the state law. In thus regulating cable television transmissions, said the Court, the State of Oklahoma had interfered unconstitutionally with the "exclusive domain" of the Federal Communications Commission, the federal agency charged with the responsibility of regulating the interstate transmission of cable television signals. 104 S.Ct. at 2703. Confronted by the argument that the statute should be found valid notwithstanding the supremacy clause, as a regulation of intoxicating liquors permitted under the Twenty-first Amendment, the Court noted that the Oklahoma statute was not a direct regulation of the sale or use of intoxicating liquors, "the core of § 2 power." *Id.* 104 S.Ct. at 2708.

Later, in *Bacchus Imports, Ltd. v. Dias*, —— U.S. ——, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), the Court considered a state liquor tax on sales of alcoholic beverages at wholesale imposed by the State of Hawaii. Sales of certain locally produced alcoholic beverages, okolehao and pineapple wine were exempted from the tax.[10] The Supreme Court found that this discriminatory exemption, clearly designed to aid a local industry at the expense of out-of-state liquor producers, was violative of the interstate commerce clause. *Id.* 104 S.Ct. at 3057. Once again, it was argued in *Bacchus* that the tax exemption, though it discriminated against interstate commerce, was nevertheless saved by Section 2 of the Twenty-first Amendment. The Court, utilizing the same balancing test it had applied in *Capital Cities Cable, Inc.*, found that temperance as a legislative goal was not served by the discriminatory provision and the state interest was insufficient to overcome the federal interest in promoting free trade among the several states.

Defendants assert that *Bacchus* is distinguishable on several grounds. First, defendants argue that in *Bacchus* the tax exemption law involved "an already existing market, subject to an excise tax," whereas in the case at bar there was no such existing market. Memorandum of Defendants, at 8. Instead, the argument continues, the ABC Law created a new market to sell a "wine product" in groceries, the effect of which "is not to prevent out-of-state wine products from being sold in New York State, but to limit their distribution to liquor stores." *Id.* This argument is of no value. It is at the very least, an argument analogous to that considered, and rejected, by the Supreme Court in *Bacchus*. There the State of Hawaii argued that the locally produced alcoholic beverages did not compete with the out-of-state products, and thus there was no burden on interstate commerce. 104 S.Ct. at 3055. In rejecting that contention, the *Bacchus* Court found that the entire purpose of the

---

**10.** Okolehao is a brandy distilled from ti or taro roots, both shrubs indigenous to Hawaii, which is also a large producer of pineapple.

tax exemption law had been to "foster the local industries by encouraging increased consumption of their product."

"Surely one way that the tax exemption might produce that result is that drinkers of other alcoholic beverages might give up or consume less of their customary drinks in favor of the exempted products because of the price differential that the exemption will permit. Similarly, nondrinkers, such as the maturing young, might be attracted by the low prices of okolehao and pineapple wine." *Id.*

Similarly, sales of the New York grape "wine product" in retail grocery stores will adversely affect the sales of the identical product produced from grapes grown out-of-state which may be sold only in less numerous and less convenient package stores. I find that the amendments to the ABC Law do not constitute the creation of a new market for the "wine product," but merely an expansion of an existing market. The same persons who would purchase a wine product in a liquor package store may now do so more conveniently in their local grocery store. Thus, the only change is that the market for wine products that had already existed in package stores was widened in a manner that discriminated against interstate commerce in out-of-state grapes.

Were this Court to find that the 1984 amendments to the New York ABC Law created a new market, this factor would not be sufficient to change the result dictated by *Bacchus*. In that case, the state also argued that in enacting the tax law exemption, it was attempting "to subsidize *nonexistent* ... and financially troubled ... liquor industries peculiar to Hawaii." (Emphasis added), 104 S.Ct. at 3056. Thus, in *Bacchus* the Supreme Court had the opportunity to find the factor of a new market dispositive of the commerce clause issue, but declined to do so.

Conceding solely for purposes of the argument that one of the purposes of the ABC Law, as was true in *Bacchus*, was to aid local industry at the expense of out-of-

state industry, nevertheless defendants assert that the overriding purpose in passing the legislation, one which did not exist in the *Bacchus* case, was to conduct a limited experiment with sale of a wine product in a different type of retail outlet, an issue over which the State had regulatory control under the Twenty-first Amendment. Memorandum of Defendants at 12.

This claimed temperance related goal is insufficient to validate the statute here. The "experiment" with grocery store sales of wine product, already commonplace in many other states, bears no logical relationship to the place where the grapes were grown to make the wine product. Clearly the dominant purpose of this discriminatory statute was to aid the grape industry of New York State, and the "experimental" aspect is both secondary and unrelated to the geographic source of the grapes. The reason for conducting this "experiment" is the identical reason for the legislation, to aid local industry. It is argued that the "control" over this experiment will be furthered by limiting it to those growers over which the State has control. Does this suggest that a state interest in health, safety or morals, including temperance, is at issue? Evidently not, because while the State has forbidden sale of wine products made from out-of-state grapes in grocery stores, it simultaneously allows the sale of the very same out-of-state wine product in the State's liquor or package stores. Although less numerous points of sale should suggest lower sales, the quantity of wine product sold in New York from out-of-state grapes is still likely to be substantial. Thus, the interest in health, safety or the general welfare of the state is furthered so minimally as to be insignificant.

■ It is argued as a final point that the purpose of the State in enacting the ABC Law was a concern for temperance, and this is demonstrated by the fact that the sale of a wine product with an alcoholic content in excess of 6% in groceries was considered first by the state legislature and rejected because of concern that a higher alcoholic content would be detrimental to

the health of the people of New York. Arguably, sale of a wine product with an alcoholic content not in excess of 6% promotes temperance to a greater extent than would the sale of a wine product with 7% or greater alcoholic content. However, once it is decided that a 6% wine product will be sold in grocery stores instead of a 7% product, the interest in temperance ends. Although the state may still promote that interest in temperance by continuing to prohibit the sale in retail grocery stores of a product with a higher alcoholic content, or any alcoholic product, once having decided to permit the sale of a 6% product in the grocery stores, it must do so in an even-handed manner. There is no temperance interest served in permitting the unlimited sale of 6% wine product with domestic grapes, while at the same time banning the sale of the same 6% wine product made with grapes grown out-of-state. The drinkers will become just as drunk on the Milwaukee made product whether the grapes come from New York, California, or any of the six or so other states which produce wine grapes in marketable quantity.[11]

Whatever the state interest in limiting the sale of a "wine product," it is clear that such interest could be served equally well by resorting to alternatives less burdensome to interstate commerce. If it is determined that the state interest is in protecting the citizens of New York from adulterated products, as has been suggested by the defendants, this occurs not in the vineyard, but in the winery or bottling plant. All wineries are under federal license and inspection. Under this statutory scheme, the location of the winery or bottling plant is irrelevant, so long as the grapes used there are grown in New York. Accordingly, no inspection goal is served. *See Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354–55, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951).

It has also been argued that because of the limited two-year period during which

this "experiment" is to take place, a minimal intrusion or burden on interstate commerce has been imposed. This, however, is not the case. The reason that this short period was chosen was to determine what effects the legislation would have on the wine and grape industry, on liquor consumption, and the revenues of the package stores. The place where the grapes are grown is irrelevant to this "experiment." Were this Court to accept such an argument, then any state could enact a series of "two-year experiments" and argue that because each of the laws contained a sunset provision, each was constitutional, although discriminatory. *Cf. Bacchus Imports, Ltd. v. Dias,* —— U.S. ——, 104 S.Ct. 3049, 3053, n. 1, 82 L.Ed.2d 200 (1984) (legislation enacted to aid local industry declared invalid despite sunset provision of five years).

To permit the 1984 amendments to the ABC Law to stand would violate the economic principle upon which our Constitution was drafted, to assure a nation of states comprising a shared common market. Those principles which made our nation great and prosperous lie at the very core of the interstate commerce clause:

> "States may not 'build up [their] domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States.' (Citations omitted). Were it otherwise, 'the trade and business of the country [would be] at the mercy of local regulations, having for their object to secure exclusive benefits to the citizens and products of particular States.'" (Citations omitted), *Bacchus, supra,* 102 S.Ct. at 3057.

In light of the overriding federal interest in free and unrestricted trade among the several states which is at stake in this matter, the 1984 amendments to the ABC Law must be found unconstitutional insofar as they require that the wine product be manufactured from 100% New York grown grapes.

Our conclusions reached here should not be taken as indicating any lack of respect

---

**11.** Texas, Virginia, Washington, Oregon and Ohio have substantial local wine industries. California leads in viniculture with New York far behind in second place.

for the underlying conclusions of the New York Legislature and Governor to the effect that viniculture in New York is a depressed industry needing help in marketing its product. As a precurser of this legislation, the New York Senate Research Service, in April 1984, acting at the request of a Special Senate Majority Committee on the New York State Grape-Wine Industry, published a report entitled "Tending the Vineyards." Basic facts of significance were developed by the report. Viniculture represents a significant part of the State's agriculture and its payrolls and tourism value provides hundreds of millions of dollars to the economies of the wine-grape regions, especially the Great Lakes, Niagara and Finger Lakes areas, and also in the Hudson Valley and Eastern Long Island areas. At least twenty-three New York counties have significant acreage devoted to commercial grapes.[12] The table grape market consumes only about two percent of New York's grape tonnage. Wineries buy about 40%, and juice, jelly, jam and other non-alcoholic end products account for the rest. New York is the second largest grape producer, but its annual tonnage of about 157,000 is far less than California's production of about 6,000,000 tons.

The Committee report noted a number of lawful means used by California to aid the wine industry, and contrasted the favorable governmental climate there with the overregulation and overtaxation of New York grape growers. For example: Food stores in California may sell wine, and those licensed for on-premises consumption may also sell bottles of wine to go. Newly planted acreage (not yet productive) is exempted from real estate taxes. This is not so in New York, which taxes not only the land devoted to grapes, but also the trellises, whether or not any income is produced. Newly planted vines require from three to five years to become productive. The Cali-

fornia tax exemption recognizes this and thereby encourages growers to replant productive acreage with more marketable varieties of grapes. California funds large amounts of money for experiments, research and education in viniculture; almost twice that expended by New York, and supports an active Wine Institute. Excise taxes on wine are higher in New York; credit sales are forbidden here, but not in California. Since confronting these disadvantages and inequalities head-on was understandably difficult for the state government, it is natural that there would be a strong temptation and incentive to carve out a protected market for a wine product made in Milwaukee or anyplace, from 100% New York grown grapes. However understandable the temptation, surrendering to it is unconstitutional.

Plaintiff's motion for summary judgment on its claims for declaratory and injunctive relief is hereby granted. Defendants' cross motion for summary judgment is denied.

IV

We now consider the scope of the remedy to be granted. The constitutional rights of plaintiff and the growers of out-of-state grapes would be vindicated if plaintiff's wine cooler and those of others which contain not more than 6% alcohol, *not* made 100% from grapes grown in New York State were to be given equal access to the shelves of the licensed New York groceries, along with the products made in New York and other states from 100% New York grapes. The Constitution would be upheld equally if all wine product were enjoined and banned from sale in the groceries. Which route will be followed involves solely a question of severability; may the unconstitutional requirement be excised leaving the groceries open to all wine coolers, or must the entire statute

---

**12.** The major grape growing counties, each having over 1,000 acres under grape cultivation in 1980 are: Chatauqua, 19,644 acres; Yates, 7,707; Steuben, 3,085; Niagara, 2,778; Erie, 2,214; Schuyler, 2,075; Ontario, 1,202; and Seneca County with 1,115 acres. Significant acreage also exists devoted to grapes in Suffolk, Orange, Dutchess, Ulster, Columbia, Greene, Albany, Rensselaer, Chemung, Tompkins, Onondaga, Wayne, Monroe, Livingston, Orleans, Wyoming and Cattaraugus Counties.

fail. This in turn presents an issue solely of state law to be resolved depending on the language of the statute and the presumed intent of the New York Legislature.

■ There is no easy answer to the issue of severability. It may well be that the New York Legislature would not have placed this product in the groceries, inviting increased access to and use of alcohol, but for the trade-off of benefitting the depressed vineyards of the State. With that countervailing benefit removed, the Legislature might well conclude to return the wine product to the package stores. This choice need not be, and should not be made by a federal court. Defendant New York State Liquor Authority should determine the issue of severability in the first instance, guided by the State Legislature and the state courts.

Accordingly, the final judgment to be entered herein shall provide for declaratory and injunctive relief consistent with the foregoing, and shall also provide that (a) the injunctive relief is stayed pending appeal, and if a timely appeal is taken, also stayed until the issuance of the mandate of the Court of Appeals, unless that Court shall otherwise direct; (b) within sixty (60) days following expiration of the stay, defendant New York State Liquor Authority shall elect either to (1) license and authorize sale of the wine product referred to in the statute without regard to the location where the grapes used therein were grown, or alternatively (2) revoke all licenses issued to grocery stores under the said statute and forbid the further retail sale of the wine product for use off premises except in licensed package stores; (c) a failure to make the timely election provided for in (b) shall be deemed an election by the Authority to find severability and to choose alternate (1) set forth in (b); (d) reserve jurisdiction to fix and allow all fees and disbursements for prevailing parties to the full extent authorized by law after notice and hearing; (e) provide that nothing contained in the judgment shall be deemed to limit the powers of the State of New York with regard to any statute or law now or herein-

after enacted except Section 3, subdivisions 36–a and 79–a of the Alcoholic Beverage Control Law, as amended, effective July 24, 1984.

Settle a judgment on ten (10) days notice.

So Ordered.