GLOBE GLASS & MIRROR COMPANY,

v.

James H. "Jim" BROWN, in His Official Capacity as the Commissioner of Insurance for the State of Louisiana.

Civil A. No. 94–4033.

United States District Court,
E.D. Louisiana.

March 4, 1996.

See also, 888 F.Supp. 768.

**448**

David L. Stone and Robert Evans Harrington, Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, Louisiana, Joel G. Chefitz and Robert K. Niewijk, Katten, Muchin & Zavis, Chicago, Illinois, for plaintiff.

David Charles Kimmel, Louisiana Department of Justice, Public Protection Division, Baton Rouge, Louisiana, for defendant.

## ORDER AND REASONS

CHARLES SCHWARTZ, Jr., District Judge.

This case presents a two-pronged constitutional challenge to recently enacted Louisiana statutes, LSA–R.S. 22:1214.1 [1] and LSA–R.S. 22:1214.2,[2] which statutes defendant submits are designed to promote a competitive market in the glass replacement industry by regulating the practices of insurers in the servicing of automobile claims. Plaintiff, Globe Glass & Mirror Company (Globe) moved for summary judgment asserting no genuine issues of material fact exist and under the applicable law summary judgment is warranted as to Count One of its Complaint declaring the Louisiana statutes unconstitutional in violation of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3.[3]

Defendant, Louisiana State Commissioner of Insurance, Jim Brown (the State), filed a cross motion for summary judgment seeking a declaration that the statutes are constitutional both under both the commerce clause (Count I) and contract clause (Count II). The cross motions of the parties were noticed for hearing on February 28, 1996, but were deemed submitted on the briefs and the documents of record without oral argument. There being no genuine issue of material fact, for the reasons hereinafter stated

---

1. Section 1214.1, entitled, "Automobile insurance; unfair trade practice" provides:

> It shall be an unfair method of competition and unfair or deceptive act or practice for any insurer to establish a contract or agreement with any company to manage, handle or arrange insurance repair work or to act as an agent for the insurer in any manner, where the company establishes a price which must be satisfied by a repair shop as a condition of doing claims repair work for the insurer, and then retains a percentage of the claim paid by the insurer.

2. Section 1214.2, also entitled "Automobile insurance; unfair trade practice" provides:

> It shall be an unfair method of competition and unfair or deceptive act or practice for any insurer to establish a contract or agreement with any individual or company to manage, handle, subcontract, broker or arrange insurance repair work for any glass repair or replacement on a motor vehicle.

3. The pertinent portion of which provides that "The Congress shall have power ... To regulate Commerce with foreign Nations, and among the several States...."

Globe's Motion for Summary Judgment as to Count I is GRANTED, Count II is DISMISSED AS MOOT, and the State's Cross Motion for Summary Judgment is DENIED.

## I. UNDISPUTED FACTS.

Globe established the USA–GLAS network to provide automobile glass repair and replacement services to insurance companies' policyholders and to the general public throughout the United States.[4] Like all networks operating in the state of Louisiana, USA–GLAS is an out-of-state business. Globe or USA–GLAS enters into contracts with insurance companies to offer their policyholders quality auto glass services at competitive prices. USA–GLAS in turn negotiates contracts with independent glass shops for the provision of auto glass repair and replacement services. Glass shops who enter into such an agreement become members of the network. The USA–GLAS network also includes auto glass shops owned and operated by Globe, but Globe does not own or operate any shops in Louisiana.[5]

Policyholders in Louisiana who need auto glass work and choose to use USA–GLAS can make arrangements directly with USA–GLAS by calling an "800" number. The policy holder can bring his car to a USA–GLAS affiliated shop or have the network's mobile repair service perform the repairs at his home, place of work, or any other convenient location.[6]

The policyholder's only obligation is to pay the deductible specified in his insurance policy; USA–GLAS pays the remainder of the bill directly to the glass shop, under the terms of USA–GLAS' contract with the glass shop. The policyholder's insurance company then pays USA–GLAS for the work under the terms of the insurer's agreement with USA–GLAS or Globe.[7]

USA–GLAS and many insurers guarantee the work that any USA–GLASS outlet performs on a policyholder's car for as long as he owns the car. If a network member performs unsatisfactory work in one state and the policyholder needs compensatory work performed in another state, any other network member can perform the compensatory work, and USA–GLAS will bear the cost.[8] Allstate's customer satisfaction surveys show that USA–GLAS regularly achieves satisfaction rates exceeding 95% and in Louisiana it has achieved rates as high as 99.4%.[9]

The network reduces costs for both the insurers and policyholder. As a result of their nationwide agreements with USA–GLAS, insurers are guaranteed a competitive price in Louisiana. The cost savings are passed on to policyholders in the form of lower premiums.[10] Insurers must pay more to local glass shops than they pay to networks.[11] Simply stated, local auto glass repair businesses compete directly with out-of-state networks such as USA–GLAS/Globe for insurance company claims business.

Policyholders are free to forego the benefits of USA–GLAS and deal directly with any auto glass shop they choose. Only 34% of Allstate's auto glass claims in Louisiana are

---

**4.** See, Plaintiff's Statement of Undisputed Material Facts, at para. 1. ULLR 2.10E requires that each copy of the papers opposing a motion for summary judgment shall include a separate, concise statement of the material facts as to which there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party are deemed admitted, unless controverted as required by ULLR 2.10E. The State did not controvert any of the factual submissions set forth in plaintiff's statement of undisputed facts as required by this rule.

**5.** *Id.* at para. 2.

**6.** *Id.* at para. 3.

**7.** *Id.* at para. 4.

**8.** *Id.* at para. 5. USA–GLAS is not a "broker", rather, the insurer's only relationship is with USA–GLAS. The insurer pays only USA–GLAS, and USA–GLAS bears full responsibility for the service, its quality, and cost overruns. See, Prigge Deposition [Plaintiff's Exhibit "A"] at 13, 28–32; Rogers Deposition [Plaintiff's Exhibit "C"] at 7–8; Strange Deposition [Plaintiff's Exhibit "D"] at 14–18.

**9.** Plaintiff's Statement of Undisputed Facts, at para. 6.

**10.** *Id.* at para. 7.

**11.** *Id.* at para. 9.

handled by USA–GLAS.[12] Glass shops in Louisiana charge insurers higher prices than they charge cash customers or glass networks because they do not have to compete on price for insured business.[13]

The complaint against Allstate or with the networks originated with the Louisiana Glass Association industry. Many of its members expressed their concerns about losing business to the networks and their inability to compete on the networks.[14] The Louisiana Glass Association Legislative Committee made efforts to lobby their legislators in favor of the anti-network statutes.[15]

The Louisiana legislature passed the "unfair trade practice"/anti-network statutes which provide:

It shall be an unfair method of competition and unfair or deceptive act or practice for any insurer to establish a contract or agreement with any company to manage, handle or arrange insurance repair work or to act as an agent for the insurer in any manner, where the company establishes a price which must be satisfied by a repair shop as a condition of doing claims repair work for the insurer, and then retains a percentage of the claim paid by the insurer.

It shall be an unfair method of competition and unfair or deceptive act or practice for any insurer to establish a contract or agreement with any individual or company to manage, handle, subcontract, broker or arrange insurance repair work for any glass repair or replacement on a motor vehicle. LSA–R.S. 22:1214.1–.2

Another Louisiana statute LSA–R.S. 22:658(D)(1), which plaintiff does not challenge, is specifically aimed at protecting Louisiana policyholders' freedom to forego the network route and deal directly with any auto glass shop they may choose. Section 658(D)(1) reads: "When making payment in-cident to a claim, no insurer shall require that as a condition to such payment, repairs be made to a motor vehicle, including window glass repairs or replacement, in a particular place or shop or by a particular entity."

After the anti-network statutes' passage, the Louisiana Glass Association pressured the Department of Insurance to enforce them against Allstate.[16] The Louisiana Commissioner of Insurance, charged with the enforcement of the subject statutes, has in fact commenced administrative proceedings against Allstate Insurance Company to enforce their provisions.[17]

On their face, the statutes outlaw agreements that networks have with insurance companies doing business in Louisiana for the provision of auto repair services. USA–GLAS has lost some of its former business, and in the event that the Louisiana Insurance Commissioner's administrative action against Allstate is successful, USA–GLAS's business in Louisiana with all insurance providers in the state will be eliminated. Without such business, USA–GLAS would cease to operate in Louisiana.[18]

Globe and USA–GLAS are interstate businesses operating throughout the United States. The auto glass networks operating in Louisiana that have arrangements in Louisiana are all interstate networks based outside of Louisiana.[19] The effect of LSA–R.S. 22:1214.1 and LSA–R.S. 22:1214.2 is to reduce and/or eliminate competition between in-state local glass businesses and out-of-state networks, such as Globe and USA–GLAS.

## II. CONTENTIONS OF THE PARTIES.

The thrust of plaintiff's motion is that the true purpose and effect of the statutes is to protect the local glass shops in Louisiana

---

**12.** *Id.* at para. 8.

**13.** *Id.* at para. 10.

**14.** *Id.* at paras. 11 and 12.

**15.** *Id.* at para. 14.

**16.** *Id.* at para. 15.

**17.** See, Defendant's Statement of Facts in its Memorandum in Support of Cross–Motion, at p. 2.

**18.** Plaintiff's Statement of Undisputed Facts, at para. 17.

**19.** *Id.* at para. 18.

from the competition for insured auto owners' business posed by the auto glass networks, which are all out of state businesses. It submits that LSA–R.S. 22:1214.1–.2 (the anti-network statutes) are naked "economic protectionism" subject to the strictest scrutiny as set forth by the Supreme Court in *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). Globe further argues that either under the "*Hughes* test" or the relatively deferential "*Pike* analysis",[20] the Louisiana statutes fail to pass muster as both require the State to prove that the legislation furthers a legitimate interest unrelated to protectionism, and the State has failed to do so here.

In its cross-motion/opposition, the State admits the statutes' purpose and effect are to protect local independent glass shops from competition from interstate Glass networks.[21] Nonetheless, it contends that the "Louisiana legislature enacted the unfair the trade practice statutes as a response to a retail market structure that threatened competition, consumer choice and possibly consumer safety,"[22] and thus, it is entitled to summary judgment in its favor as to Count One. As to Count II, the State argues that if by the enactment of the subject statutes Louisiana has impaired the contractual rights of any private parties, it has done so in pursuit of important state interests, and thus, the statutes are not unconstitutional impairments of such existing contracts.

Globe filed a formal reply brief first noting that should the Court find in favor of Globe on its motion for summary judgment as to Count I, Count II will be entirely moot. It further argues that the State fails identify any purposes which would not be better served through other means without discriminating against interstate commerce. Plaintiff further highlights the State failure to address, much less distinguish, *Allstate Ins. Co. v. South Dakota,* 871 F.Supp. 355, 359 (D.S.D.1994), wherein a district court struck down a South Dakota statute with precisely the same effect as the presently challenged Louisiana statutes holding the South Dakota statute unconstitutional under the Commerce Clause. Globe further argued in opposition to the State's motion as to Count II (the Contract Clause claim) that: (1) the statutes' plain language applies only to contracts executed after their enactment; and otherwise, (2) the statutes clearly violate the Contract Clause since the resulting impairment of contracts cannot be justified as reasonable or necessary.

### III. ANALYSIS.

█ The "dormant" Commerce Clause, Article I, Section 8, Clause 3 of the Constitution, grants Congress the power "to regulate Commerce . . . among the several States. . . ." In *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 669, 101 S.Ct. 1309, 1315, 67 L.Ed.2d 580 (1981), the

**20.** See, Discussion at pp. 10–12 of this Order and Reasons.

**21.** The State, borrowing language from the Supreme Court's decision *Parker v. Brown,* 317 U.S. 341, 362–63, 63 S.Ct. 307, 319, 87 L.Ed. 315 (1943) argues: "The interests in this case 'present a problem local in character and urgently demanding state action for the economic protection of those engaged in one its important industries.' " See, Memorandum In Support of Cross Motion, at p. 6 (emphasis supplied by this Court). It is undisputed that the legislation at issue provides economic protection to local glass shops by effectively eliminating their competition—out-of-state networks. The State appears to be likening its local automobile glass repair industry to the raisin industry in California. The passage quoted from *Parker* appears in a paragraph which reads:

> Examination of the evidence in this case and available data of the raisin industry in California, of which we may take judicial notice,

leaves no room to doubt that the evils attending the production and marketing of raisins in that state present a problem local in character and urgently demanding state action for the economic protection of those engaged in one of its important industries. Between 1914 and 1920 there was a spectacular rise in price of all types of California grapes, including raisin grapes. . . .

317 U.S. at 362–65, 63 S.Ct. at 319–20. Moreover, the regulation at issue in the *Parker* decision applied only to transactions wholly intrastate before the raisins were ready for shipment in interstate commerce. *Id.* at 360–61, 63 S.Ct. at 318. Placing the State's quotation from *Parker* in context, it is evident to the Court that this case and *Parker* are miles apart.

**22.** See, Defendant's Memorandum in Support of Cross Motion for Summary Judgment, at p. 5.

Supreme Court outlined the evolution of the Commerce Clause as follows:·

> The Clause is both a 'prolific sourc[e] of national power and an equally prolific source of conflict with legislation ·of the state[s].' *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 534, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949). The Clause permits Congress to legislate when it perceives that the national welfare is not furthered by the independent actions of the States. It is now well established, also, that the Clause itself is 'a limitation upon state power even without congressional implementation.' *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977). The Clause requires that some aspects of trade generally must remain free from interference by the States. When a State ventures excessively into the regulation of these aspects of commerce, it 'trespasses upon the national interests,' *Great A & P Tea Co. v. Cottrell,* 424 U.S. 366, 373, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976), and the courts will hold the regulation invalid under the Clause alone.

*Id.* In summary, the clause not only bestows powers upon Congress to regulate interstate commerce, but also limits the powers of the states to "erect barriers against interstate trade." *Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). However, the limitation on state regulation is not "absolute." *Id.* at 36, 100 S.Ct. at 2015. The states "retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Id.*

■ In scrutinizing state regulations under the Commerce Clause, courts inquire whether the regulations have only an "incidental" effect on interstate transactions, or whether they "affirmatively discriminate" against such transactions. *Maine v. Taylor,* 477 U.S. 131, 138–39, 106 S.Ct. 2440, 2447–48, 91 L.Ed.2d 110 (1986). Statutes which regulate "even-handedly" and which have only

incidental affect on interstate commerce violate the clause only if the burdens they impose on interstate trade are "clearly excessive in relation to the putative local benefits." *Id.,* at 138, 106 S.Ct. at 2447 (citing, *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 141, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). In such cases, the extent of the burden which the Commerce Clause will accept depends on the nature of the local interest, and whether that interest can "be promoted as well with a lesser impact on interstate activities." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. This relatively deferential standard has been dubbed the "*Pike* analysis."

■ On the other hand, statutes which affirmatively discriminate against interstate transactions are the subject of stricter scrutiny. *Id.* They are invalid unless the state demonstrates that such statutes: (1) serve a legitimate local purpose; *and* (2) that such purpose could not be served adequately by available non-discriminatory means. *Maine v. Taylor,* 477 U.S. at 153, 106 S.Ct. at 2455. This test was formulated by the Supreme Court in *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).

Both the *Hughes* test analysis and the *Pike* analysis focus on the burdens on interstate commerce in light of local purposes and available alternatives. Under either approach the critical consideration is the overall effect of the statute on both local and interstate activity.[23] The difference obtains in that a closer means-end relationship· is required of a statute that is discriminatory on its face than one which has only an incidental effect on interstate commerce.

The Supreme Court in *Philadelphia v. New Jersey,* 437 U.S. 617, 623, 624, 98 S.Ct. 2531, 2535–36, 57 L.Ed.2d 475 (1978) explained the difference between the two levels of scrutiny as follows:

> The opinions of the Court through the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing

---

**23.** *Brown–Forman Distillers v. N.Y. State,* 476 U.S. 573, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552

(1986).

that incidental burdens on interstate commerce may be unavoidable when a state legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected.... The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a state's borders.... But where other legislative objectives are credibly advanced and there is not patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike v. Bruce Church Inc.....*

*Id.*

In *Brown–Forman Distillers v. N.Y. State,* 476 U.S. 573, 582, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986), the Supreme Court observed: "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry." *Id.* (citing, *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (New Jersey statute prohibiting importation of waste originating or collected outside the state struck down under the Commerce Clause); *Shafer v. Farmers' Grain Co.,* 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909 (1925) (state regulatory scheme which had the effect of regulating interstate commerce in grain purchasing barred by Commerce Clause); and *Edgar v. MITE Corp.,* 457 U.S. 624, 642–44, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) (Illinois anti-takeover act violated ·Commerce Clause where it sought to regulate securities trans-

actions having no connection with the state)).[24]

■ In the case at bar, plaintiff argues that the undisputed purpose and effect of LSA–R.S. 22:1412.1–.2 (the anti-network statutes) is to increase the profits of local auto glass shops by decreasing and/or eliminating competition from the interstate networks. It is undisputed that the auto glass networks that have arrangements with insurers in Louisiana are all interstate networks. The anti network statutes outlaw such arrangements. These networks, which are all out-of-state entities, compete with local glass shops for insurance companies' dollars, and such interstate competition has reduced the local glass shops' profits. Louisiana's statutes at issue in this case effectively put an end to that competition.

The State argues that the "unfair trade practice" statutes were enacted to guarantee consumer choice in the selection of glass shops, and to create an open and free market in which glass shops, both interstate and intrastate,[25] can operate without the artificial control of supply created by brokering agreements. The State cites *Exxon Corp. v. Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) in support of its position. It submits that the *Exxon* decision is squarely on point and determined that a state may regulate the operations of its retail markets if in doing so it does not discriminate against interstate firms. *Id.,* at 126–27, 98 S.Ct. at 2214. However, the *Exxon* Court buttressed its decision with the finding that the challenged regulation did not discriminate against several prominent interstate oil companies. *Id.*

---

**24.** See also, *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.,* — U.S. —, —, 114 S.Ct. 1677, 1684, 128 L.Ed.2d 399 (1994) (striking down a trash flow control ordinance that did not in explicit terms seek to regulate interstate commerce, but did nonetheless by its practical effect and design); *Healy v. Beer Institute, Inc.,* 491 U.S. 324, 340–41, 109 S.Ct. 2491, 2501, 105 L.Ed.2d 275 (1989) (holding Connecticut's beer price affirmation statute violative of Commerce Clause and noting that the Supreme Court has "followed a consistent practice of striking down state statutes that clearly discriminate against interstate commerce ... unless that discrimina-

tion is justified by a valid factor unrelated to economic protectionism."). *Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) (holding Florida statute prohibiting out-of-state banks and others from owning or controlling Florida investment advisory businesses and another statute prohibiting certain out-of-state corporations from performing certain trust and fiduciary functions, violative of the Commerce Clause). ·

**25.** The Court here notes that it is undisputed that there are no intrastate networks.

The present case is factually distinguishable from the *Exxon* decision since the Louisiana statutes indisputably have the effect of discriminating in favor of the local glass auto shops and shifting all the glass repair business back from interstate networks to the local auto glass repair businesses. It is of no moment that the anti-network statutes apply regardless of state citizenship, since all of the networks operating in Louisiana are out-of-state businesses and by definition all local glass shops are in-state businesses. The Louisiana statutes at issue clearly have a discriminatory effect on interstate commerce, a situation which was not present in *Exxon.*

The State's argument that the statutes purpose is to protect consumer choice is transparent, at best. Louisiana already has in effect yet another statute, LSA–R.S. 22:658(D)(1) which requires that insurers maintain policyholder's choice of automobile repair services, and thus, guarantees policyholders' choice.

As to the State's argument that in addition to consumer choice, artificially low prices also endanger quality and safety, as shops will be forced to cut corners to make up for lost revenue, the Supreme Court has already nixed precisely the same argument. In *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 769, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976) the Court recognized that the "cutting corners" argument is nothing more than an after-the-fact rationalization for protectionist laws stating:

> There is no claim that the [legislation] in any way prevents the cutting of corners by the [retailer] who is so inclined. That [retailer] is likely to cut corners in any

event. The only effect the [legislation] has on him is to insulate him from price competition and to open the way for him to make a substantial, and perhaps even excessive, profit in addition to providing an inferior service.

*Id.*

Here too, there is no claim that the challenged legislation prevents auto glass service businesses from cutting corners if they are so inclined. The challenged legislation addresses neither safety nor quality control. No studies or other evidence were submitted which would tend to suggest that the statutes would effect either of these worthy goals. Moreover, there is nothing in the record to suggest that the Globe/USA–GLAS, with its lesser prices to insurance companies such as Allstate, is providing auto glass of lesser quality or safety than that provided by local glass businesses. The challenged statutes address insurers' agreements with companies to manage or arrange insurance repair work *and* consequent price negotiation. It appears singularly aimed at preventing that practice. The undisputable effect of the challenged legislation in this case is to insulate local auto glass repair businesses from price competition with out-of-state networks.

The State argues that networks "artificially decrease the market price of glass repair" and "threaten[ ] the financial stability of the retail glass industry."[26] Viewed in light of the undisputed facts,[27] the State's argument is tantamount to an admission that the statutes' purpose is to protect local glass shops against competition from the networks. Borrowing language from the court in *Allstate Insurance Company v. South Dakota,* 871 F.Supp. 355 (D.S.D.1994),[28] "the State cannot

---

26. See, Defendant's Memorandum In Support of its Cross Motion for Summary Judgment, at p. 5.

27. It is undisputed that local auto glass repair businesses charge insurers and their insureds higher prices than they charge cash customers or glass networks because they do not have to compete on price for insured business. Essentially, competition from out-of-state networks prevents the local auto glass repair shops from overcharging insurance companies and their policyholders. The networks offer lower prices by doing the information gathering and the price shopping for the insurance company and their insureds.

28. In *Allstate Ins. Co. v. South Dakota,* 871 F.Supp. 355 (D.S.D.1994), the district court considered a South Dakota statute which effectively prevented Allstate from getting any advantage in contracting with USA–GLAS by prohibiting it from telling its insureds about the network. The court held that the effect of the South Dakota's statute was to deprive interstate networks of any benefits in contracting with insurance companies to decrease price competition for local glass businesses. As to the state's purpose of protecting South Dakota auto glass businesses from the effects of unfair acts by the insurers and networks, the court held that state anti-trust laws would serve the State's interests equally well.

properly protect [local businesses] from the networks who will charge a lower price and thereby help the local businesses maintain their profit margins." *Id.* at 358. There is no question but that direct price regulation, subsidies, and tax benefits would all be much more direct and less restrictive means of "stabilizing the glass industry."

Whether scrutinized under the *Hughes* test or the more lenient *Pike* analysis, LSA–R.S. 22:1214.1 and LSA–R.S. 22:1214.2 are violative of the Commerce Clause. Although the State has offered several justifications noted above, the challenged legislation clearly has the effect of impermissibly burdening interstate commerce by discriminating against the out-of-state networks in favor of local auto glass repair businesses. Simply stated, their effect is the elimination of the local auto glass repair shops' out-of-state competition—the networks. Such cannot be tolerated where as here, even if there are legitimate local purposes for the statutes, such can be "promoted as well [and perhaps more effectively] with a lesser impact on interstate activities." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 2016, 64 L.Ed.2d 702 (1980).[29]

The Louisiana statutes at issue here squelch out-of-state (the network's) competition in the auto-glass repair service. They are *per se* invalid. Moreover, the instant case does not fall into that narrow class of cases in which the State can demonstrate, under either rigorous scrutiny or the more lenient *Pike* analysis, that no other means exist which may advance any legitimate local interests the State may have.

Accordingly, and for all of the above and foregoing reasons,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is hereby GRANTED.

IT IS FURTHER ORDERED that Count II of plaintiff's complaint is DISMISSED AS MOOT.

IT IS FURTHER ORDERED that Defendant's Cross Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that counsel for plaintiff shall submit the proposed form of judgment consistent with the Court's written reasons.

The court noted South Dakota law already requires that insurers maintain policyholder choice of automobile repair services. The court further found nothing in the record indicating that USA with its lesser prices to Allstate is providing auto glass of lesser quality or safety than that provided by local glass businesses. The court also found that consumer safety laws would more effectively promote consumer safety than providing price protection to local businesses. *Id.* at 358.

29. "The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, —— U.S. at ——, 114 S.Ct. at 1682.